**LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, Michael Allen, Wa–Swa–Gon Treaty Association, Thomas Maulson, Robert Martin, Nick Hockings, Gilbert Chapman, Plaintiffs,**

**v.**

**STOP TREATY ABUSE–WISCONSIN, INC., Dean Crist, Tommy Handrick, Unknown John Does and Jane Roes, Defendants.**

**No. 91–C–117–C.**

United States District Court, W.D. Wisconsin.

Jan. 6, 1992.

Brian L. Pierson, Charne, Clancy, Krueger & Pollack, Milwaukee, Wis., for plaintiffs.

Richard E. Sommer, Sommer, Olk & Schroder, Rhinelander, Wis., for Stop Treaty Abuse–Wisconsin, Inc., and Dean Crist.

Tommy Handrick, pro se.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil case for injunctive relief in which plaintiffs seek a permanent injunction preventing the named defendants from interfering intentionally with the exercise of treaty-recognized hunting, fishing and gathering rights by any member of the plaintiff band. A preliminary injunction to this effect has been in place since March 15, 1991. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty-Abuse, Wisconsin, Inc.*, 759 F.Supp. 1339 (W.D.Wis.1991).

The case is before the court at this time on plaintiffs' motion for summary judgment; on plaintiffs' motion to strike the supplementary brief and affidavit in opposition to the motion for summary judgment filed by defendants Stop Treaty Abuse–Wisconsin, Inc. and Dean Crist; on the motion of defendants Stop Treaty Abuse and Dean Crist for leave to file a second amended answer to assert two additional affirmative defenses; and on plaintiffs' motion to strike the untimely motion for summary judgment filed by the same defendants. I turn first to the motion for leave to file a second amended answer.

At a hearing held on October 31, 1991, I denied a motion by these same defendants to file a first amended answer to add as an affirmative defense the claim that the individual plaintiffs lacked standing to pursue this suit because they are not full-blooded Chippewa. The motion was untimely, and in my view so lacking in merit as to make amendment futile. *See Verhein v. South Bend Lathe, Inc.*, 598 F.2d 1061, 1063 (7th Cir.1979) ("court may deny leave to amend where the proposed amendment fails to allege facts which support a valid theory of liability ... or where the party moving to amend has not shown that the proposed amendment has substantial merit")

In their new motion to amend, defendants Stop Treaty Abuse and Crist (hereafter, defendants) seek to assert the same claim in their proposed amended answer, as well as the claim that the plaintiffs are barred by the doctrine of res judicata from asserting retained rights to hunt, fish and gather in the ceded territories because the Indian Claims Commission ruled definitively on those rights in 1973, 1977 and 1978.

■■■ Defendants have shown no reason to reverse the earlier holding that there is no merit to their claim that the individual plaintiffs lack standing to pursue this action because they may lack proof that they are full-blooded Chippewa. The Lac du Flambeau band has treaty-protected usufructuary rights to hunt, fish and gather in the ceded territory. Those rights may be exercised by its members. Who those members are is to be determined by the band under the well-settled law that Indian tribes have the power to regulate their internal and social relations with respect to membership, inheritance and domestic relations, subject to the plenary authority of Congress. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55–56, 98 S.Ct. 1670, 1675–76, 56 L.Ed.2d 106 (1978). Defendants have no standing to challenge the criteria by which the band determines its membership, and they are not contending that the Lac du Flambeau band does not consider the individual plaintiffs to be members of the band. Therefore, there is nothing to the affirmative defense defendants are seeking to assert.[1]

---

1. In their brief in opposition to plaintiffs' motion for summary judgment, defendants raise what appears to be a variation of the theme that plaintiffs have no standing to bring this suit. Defendants argue that plaintiffs cannot assert any treaty rights because the Lac du Flambeau band has not maintained an organized tribal structure, that is, the band cannot show that

■ In their proposed amendment defendants contend that the Indian Claims Commission rulings bar the tribes from asserting their usufructuary rights. That claim is out of place in this law suit. The plaintiff tribe's right to hunt, fish and gather in the ceded territory of Wisconsin has been determined in other litigation to which all of the citizens of the State of Wisconsin were party, *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin (Final Judgment),* 775 F.Supp. 321 (W.D.Wis.1991). That holding may not be reexamined in this suit. The res judicata effect of the Indian Claims Commission proceedings could have been raised in that suit (and was raised, in connection with the timber subphase of ·the case, *see Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin (Timber),* 758 F.Supp. 1262 (W.D.Wis.1991)). Therefore, the ordinary principles of res judicata preclude defendants from litigating in this suit the effect on the earlier suit of the Indian Claims Commission proceedings. *See generally* 18 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure, §§ 4401–4478 (1981).

Because there is no merit to either of defendants' proposed affirmative defenses, it would be futile to grant them leave to serve and file their untimely proposed second amended answer. Their motion for such leave will be denied.

I turn next to plaintiffs' motion to strike defendants' supplemental brief and affidavit in opposition to plaintiffs' motion for summary judgment. Plaintiffs' opposition to this brief derives from the same basis as their opposition to defendants' motion to file and serve a second amended answer. In the supplemental brief, defendants argue that the Indian Claims Commission proceedings preclude the plaintiffs from asserting any usufructuary rights in the ceded territory. Because defendants have been denied leave to amend their answer to raise this claim, and because the issue cannot be litigated in this case, defendants' argument has no relevance to any issue in the case and need not be considered. Plaintiffs' motion to strike the supplemental brief and affidavit will be granted.

For the same reasons, plaintiffs' motion to strike the defendants' motion for summary judgment will be granted. The motion is based on the same meritless claims defendants seek to add to their answer.

I turn finally to plaintiffs' motion for summary judgment. For the purpose only of deciding this motion, I find that there is no genuine issue with respect to any of the following material facts.

## UNDISPUTED FACTS

The Lake Superior Chippewa are a tribe recognized by the United States. The Chippewa entered into treaties with the United States by which they ceded territory to the federal government, but reserved the right to hunt, fish and gather food.

Plaintiff Michael Allen is president of the Lac du Flambeau band of Lake Superior Chippewa Indians and is its highest elected official. Wa–Swa–Gon Treaty Association is an unincorporated association of members of the Lac du Flambeau band and others. It supports the tribe's exercise of off-reservation treaty-recognized fishing rights. Plaintiffs Tom Maulson, Nick Hockings, Robert Martin and Gilbert Chapman are members of the Lac du Flambeau band who reside on the Lac du Flambeau reservation. As members of the band, they have the right to engage in off-reservation treaty-protected fishing in the ceded territory.

some defining characteristic of the original tribe persists in an evolving tribal community, *Native Village of Venetie I.R.A. Council v. Alaska,* 918 F.2d 797 (9th Cir.1990), *amended, op. withdrawn, superseding op.,* 944 F.2d 548 (9th Cir.1991), and therefore, it is not entitled to claim the benefits of the treaties between the federal government and the tribe from which the Lac du Flambeau claims descent. This issue cannot be raised in this action. The Lac du Flambeau band's entitlement to the benefits of the treaties has been resolved definitively in litigation between it and the State of Wisconsin. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin (Final Judgment),* 775 F.Supp. 321 (W.D.Wis.1991). The principles of res judicata bar relitigation of the issue.

Defendant Stop Treaty Abuse–Wisconsin, Inc. is a for-profit corporation organized under the laws of the State of Wisconsin, with its principal place of business at AV 2075 Witches Lake Road, Woodruff, Wisconsin. Defendant Dean Crist is a member and co-founder of Stop Treaty Abuse–Wisconsin, Inc. and a spokesman for it. He resides in Minocqua, Wisconsin. Defendant Tommy Handrick is a resident of Minocqua and has been a member of Stop Treaty Abuse–Wisconsin, Inc. at all relevant times.

The significance of fishing for the Chippewa is religious and cultural as well as economic. Traditional religious rituals and festivals are an important part of Chippewa fishing activities.[2]

In order to spear walleye, Chippewa spearers wear helmets similar to a miner's, with a lantern attachment, and they carry a ten foot spear. Typically, the spearer will stand in the front of a boat, concentrating all of his attention on the water, which is lighted by his helmet lamp. High wakes interfere with a spearer's ability to spear, and create the danger of his falling into the near-freezing water.[3]

**2.** Defendants try to put this fact into dispute with the affidavits of persons present on the boat landings who say that they observed few instances of religious ceremonies occurring on the landings in connection with spearing. Whether these persons observed ceremonies in a particular place at a particular time does not rebut plaintiffs' proposed finding that spearing has religious and cultural significance to the Chippewa.

**3.** Defendants have submitted affidavits of experienced fishers who claim that it is not necessary, or even wise, to stand in a boat to spear, or to wear a helmet with a lamp, or to use a spear as long as ten feet. This does not put into dispute plaintiffs' proposed finding that standing in a boat with a ten foot spear and wearing a miner's helmet is the way that the Chippewa do spear, and that high wakes interfere with this practice.

**4.** Defendants try to put this fact into dispute by asserting that plaintiffs were never actually prevented from launching their boats, but were only blocked temporarily. Defendants' effort fails.

**5.** Defendants attempt to create a genuine issue about this fact by asserting that it is disputed

Stop Treaty Abuse–Wisconsin, Inc. was formed between the 1988 and 1989 walleye spearing seasons. After it became active, protests against Chippewa spearing escalated, crowds increased at the boat landings where spearing was taking place and the practice of creating wakes to interfere with spearing became widespread. Stop Treaty Abuse–Wisconsin encouraged as many people as possible to gather at boat landings and on lakes. The group supported the assembling of boats around launching areas while plaintiffs were trying to launch their boats. At Catfish Lake in 1989, Stop Treaty Abuse members and others encircled the launch area with 35 to 40 protest boats to make it more difficult for Lac du Flambeau to launch their boats.[4]

It was one of Stop Treaty Abuse's objectives to get as many boaters as possible driving back and forth on the lakes in an effort to disturb Lac du Flambeau spearers attempting to exercise their fishing rights. At protests organized by Stop Treaty Abuse–Wisconsin, members and others intentionally created high wakes to interfere with spearers who were attempting to exercise their off-reservation spearing rights.[5]

whether the wakes made by Stop Treaty Abuse members were any higher than the normal wave level that may be encountered on any given lake and whether any wakes so created were hazardous in nature and intended to interfere with spearers. They support their assertions with affidavits, including one of defendant Crist, in which Crist avers that

he has operated a boat on numerous lakes on occasions when Indian spear fishing was occurring and that in the course of such operation, his boat has inevitably created a wake as it moved through the water and that the size of such wakes was not necessarily larger than the size of waves created on the surface of the lakes by a brisk wind.

Affidavit of Dean Crist, Nov. 11, 1991, at 5. By itself, this affidavit does not put into dispute the proposed finding that defendants created high wakes intentionally to interfere with spearers efforts to exercise their treaty rights. A wake "the size of waves created ... by a brisk wind" will interfere with a spearer trying to fish on an otherwise calm lake while standing in a boat. As Crist admitted in his deposition, spearers need calm water if they are going to spear from a boat. Deposition, Feb. 26, 1991, at 130, 132. To the extent that Crist attempts to contradict his earlier, explicit deposition testimony con-

On at least three occasions in 1989, Stop Treaty Abuse announced it would pay fines for all persons who crossed police lines at launching areas. At Rainbow Flowage in 1989, Stop Treaty Abuse members crossed police lines to occupy the area where the plaintiffs were launching their boats. In May 1989, Stop Treaty Abuse members and others crossed police lines at Trout Lake to the area in which the plaintiffs were launching their boats. Later, Stop Treaty Abuse paid the court costs of all the persons arrested. In 1990, Stop Treaty Abuse encouraged members and others to cross police lines at Big St. Germain Lake.

Also in 1989, Stop Treaty Abuse discussed with its members and others the spraying of rocks with insect repellant and the use of blunted hooks as drifting anchors to interfere with plaintiffs' treaty-protected right to use gill nets. The group put together and distributed protest kits that included steel whistles for use by protesters at boat landings in 1991.

The purpose of the on-water protests and the protests at the boat landings was to stop the plaintiffs' exercise of their right to engage in off-reservation spearing of walleye and muskellunge.[6] The goal of Stop Treaty Abuse–Wisconsin has been to stop the plaintiffs from exercising their treaty recognized right to spear fish, by doing everything in its power to stop plaintiffs' spearing.

At Stop Treaty Abuse's major rally in 1991 at Minocqua, leaders encouraged participants to protest that night (April 20) at Sand and Dam Lakes. That night at the Sand and Dam Lake boat landings, a mob of protesters surrounded a small group of Indians, shouted threats and racial slurs at them, pushed in on them and blew whistles in their ears.

Stop Treaty Abuse had an information network for gathering information about spearing activities and for disseminating such information.

Defendant Crist decided where Stop Treaty Abuse would protest. It was his stated policy to crowd the boat landings with people and vehicles to make it more difficult for spearers to launch boats, to use artificial decoys to interfere with spearing, to get as many boaters as possible driving back and forth on the lakes making waves to make it difficult for spearers to stand in their boats and to see the fish. At a Stop Treaty Abuse meeting in April 1989, he advised members on techniques for interfering with Chippewa spearing. He has stated, "our efforts to hinder the tribal spearing and netting harvest won't be stopped...." "Every fish saved from the spearers will mean an extra fish for the sport anglers ... that is why disturbing spearers will be effective...." Deposition of Dean Crist, Feb. 26, 1991, at 110–112.

Defendant Crist made wakes on lakes where Lac du Flambeau members were spearing on almost every evening that there was spearing in 1989 and 1990. He did so intentionally, in an effort to impede spearing. In 1989, at Minocqua Lake, Trout Lake and Big Arbor Vitae Lake,

cerning his efforts to create rough water conditions by filling "the back live wells and driving [his boat] half throttle [which creates greater displacement of water]" deposition, Feb. 26, 1991 at 131, and that driving in such a water is an effective way in which to minimize the spearing of fish, *id.,* his affidavit must be ignored. *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir.1985) (district court has duty to ignore sham issues in determining appropriateness of summary judgment; parties are not allowed to create credibility issues by contradicting their own prior testimony). *See also Lovejoy Electronics, Inc. v. O'Berto,* 873 F.2d 1001, 1005 (7th Cir.1989) (same).

6. Defendants try to put this fact into dispute by arguing that their primary effort was to save walleyes. However, defendant Crist's deposi-

tion testimony is unequivocal: the way to stop the walleye catch was by preventing plaintiffs from fishing. *See* deposition, Feb. 26, 1991, at 36 (Stop Treaty Abuse planned to "do our level best to minimize the unfair exploitation of Wisconsin resources by the Chippewa ... if possible we would like to stop the harvest"); at 39 (Stop Treaty Abuse planned "to crowd boat landings with people and vehicles to make it more difficult for spearers to launch boats"); at 39–40 (Stop Treaty Abuse "encouraged the use of artificial decoys to interfere with spearing in 1989"); at 70–72 ("we are going to take one county, one weekend, and do our damnedest to stop it"). Defendant Crist's conclusory statements to the contrary in his Nov. 11, 1991 affidavit do not create a genuine issue of fact.

defendant Crist participated in on-water protests against Chippewa gill netting. At Big Arbor Vitae Lake in 1989, Stop Treaty Abuse members, including defendant Crist and others, formed a flotilla of boats around the launching area while spearers tried to launch their boats. At Plum Lake in 1990, defendant Crist and other Stop Treaty Abuse members, including board member David Worthen, made high wakes while plaintiff Nick Hockings was trying to spear. Defendant Crist was in a large assemblage of boats clustered around the boat landing at Catfish Lake in 1990, as Lac du Flambeau spearers attempted to launch their boats.

Stop Treaty Abuse paid defendant Crist's fines and legal fees in connection with his arrests at Rainbow Flowage and Trout Lake in 1989 and paid his legal fees in connection with his arrests at Plum Lake in 1989 and 1990, at Big St. Germain Lake in 1990, and at Catfish Lake in 1990.

In January 1991, defendant Crist drove his truck onto a frozen lake to observe a Chippewa spearer and to circle the spearer in his truck.

Defendant Crist believes that Stop Treaty Abuse has been effective in minimizing plaintiffs' fish harvest.

In 1989 or 1990, defendant Handrick was in a pontoon boat at Minocqua Lake with Al Soik, Elaine Soik, Lois Pavlovich, Charles Ahlborn, Jack Lanta and Rose Lanta protesting Chippewa gill netting. The pontoon boat approached close enough to Lac du Flambeau gill netters to make physical contact. In 1989, at Big Arbor Vitae Lake, defendant Handrick participated in an on-water protest against Chippewa gill netting. Defendants Handrick and Crist were part of an assemblage of boats that encircled the landing at Catfish lake as Lac du Flambeau spearers tried to launch their boats. Defendant Handrick crossed police lines at Trout Lake in 1989 together with other Stop Treaty Abuse protesters. Stop Treaty Abuse paid his legal fees. Defendants Crist and Handrick have operated boats or been passengers in boats that made wakes within 500 feet of boats in which Lac du Flambeau members were trying to spear. In 1990, defendant Handrick was in a boat with defendant Crist on Big Arbor Vitae Lake protesting Lac du Flambeau gill netting.

On occasions during 1989 and 1990, protesters pelted spearers, their family members and friends with stones. On many occasions during the 1989 and 1990 spearing seasons, protesters crowded groups of Indians, subjecting them to unwanted physical contact while blowing whistles, shouting threats, racial slurs and insults.

At Star Lake in 1990, protesters blew whistles in the ears of Anita Thoms Koser, blocked her way to prevent her from reaching the lake where she intended to perform a religious ritual, surrounded her and tried to force her to buy a Stop Treaty Abuse button. In 1991, at Lake Nakomis, protesters assaulted her again by blowing whistles at her at close range.

Protesters at landings in 1989 and 1990 threatened spearers and their families with violence. At protests organized by Stop Treaty Abuse, members and others have interfered with plaintiffs' right to practice their religion and have prevented them from sharing fishing activities with their children and other members of their band.

At the Stop Treaty Abuse rally in Torpy Park in Minocqua in 1990, the speaker's podium featured a caricature of an Indian.

Stop Treaty Abuse literature prepared by defendant Crist, Charles Ahlborn and Al Soik for distribution to members and the public is filled with inflammatory statements about the plaintiffs, such as

a. Chippewa spearers use spears "mass produced in China and Korea," and outboard motors "manufactured in Japan";

b. Many speared fish are sold;

c. "Thousands of fish spoil because of warm weather and the lack of ambition to clean them. Each year thousands of spoiled game fish are dumped in dumps and along road sides because tribal member [sic] didn't want to clean them";

d. Tribal members receive "huge amounts of free government surplus food including cheese, butter, milk and other vast amounts of 'commodity' foods.

Along with these free foods they receive free food stamps and a cost of living allowance of over $20,000/household/year. They are also eligible for free government housing, subsidized heat and light, a whole list of government entitlements and subsidies, and a host of other government benefits. Tribal members receive 100% free medical and dental care, free pharmaceutical coverage, free day care and free and complete educational subsidies.

Al Soik is a former chairman and current vice-chairman of Stop Treaty Abuse. He often led protesters in chants using a bullhorn. He did so

> as a satirical means of pointing out the anachronistic and inappropriate nature of allowing a practice established in an era of birchbark canoes, flaming torches, and hardened wood spears to be conducted with the aid of pickup trucks, aluminum and fiberglass boats powered by outboard motors, high-powered headlamps, and steel-tined spears....

Affidavit of Al Soik of October 30, 1991 at 2–3. Soik has chanted, "Tom, Tom, the white man's son," as a means of drawing attention

> to what he believes is the hypocritical and contrived nature of the invocation of Indian heritage and tradition by Maulson and other members of a tiny band of spiteful and irresponsible individuals to justify the rape and destruction of a resource and that the chant was not intended to be demeaning of Indians in general.

*Id.* at 3.

Elaine Soik is a member of Stop Treaty Abuse's board of directors. Charles Ahlborn is a former chairman of Stop Treaty Abuse. David Worthen is a member of Stop Treaty Abuse's board of directors. Al Soik, Elaine Soik, Charles Ahlborn and defendants Handrick and Crist have "chanted Tom, Tom, the white man's son" and "Hi–How–are–ya" to the mock beat of a tom-tom at the boat landings with other protesters. David Worthen has a notice in his pub in the form of a help wanted ad that reads, "Small Indians wanted for mudflaps.

Must be willing to travel." Defendant Crist is aware of the notice.

In 1990, at Big St. Germain Lake, defendant Handrick said, "Here comes another fucking Indian on relief," as Donald Smith arrived.

## OPINION

■ In the order entered herein on March 15, 1991, I found that plaintiffs had demonstrated a likelihood of success on their claims that defendants had violated plaintiffs' rights under 42 U.S.C. §§ 1982, 1985(3) and 1986. *Lac du Flambeau Band,* 759 F.Supp. 1339. Based on the facts that I have found to be undisputed, I hold now that plaintiffs have established the violations of their rights under 42 U.S.C. § 1982, and are entitled to the entry of a permanent injunction. (This resolution makes it unnecessary to reach the issue of plaintiffs' rights under § 1985(3) and 1986 or state law.) Defendants have failed to show the existence of a genuine dispute about any of the facts material to a decision on plaintiffs' § 1982 claim. There is no need for a trial; plaintiffs are entitled to injunctive relief as a matter of law.

> [Fed.R.Civ.P.] 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

### A. Section 1982

42 U.S.C. § 1982 guarantees all citizens of the United States the same rights enjoyed by white citizens to "inherit, purchase, lease, sell, hold and convey real and personal property," and forbids both official and private interference with such rights. I have previously held in this case that the Lac du Flambeau band's right to exercise its usufructuary rights in the ceded territory is a property right. *Lac du*

*Flambeau Band,* 759 F.Supp. at 1350. Defendants argue, however, that treaty rights cannot be subject to the protection of § 1982 because "[protection of an exclusive right to engage in hunting and fishing activity claimed by a political entity has no bearing on 'equality between persons of different races.' It does not contribute to 'eliminating all discrimination and the effect thereof on the ownership of property.' "

■ Defendants base their argument on a case holding that preferential treatment for tribal members is not racially discriminatory since it is rooted in a political relationship. *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (establishment of preference for hiring Indians in the Bureau of Indian Affairs not unconstitutional or violation of the Equal Employment Opportunities Act of 1972). However, cases addressing the constitutionality of special hiring preferences for Indians are irrelevant. That the federal government may establish special preferences *in favor of* Indians without running afoul of the requirements of the Constitution or of federal anti-discrimination statutes because of its political relationship with Indians does not mean that private persons are free to discriminate *against* Indians for the same reason.

■ The issue in this case is the right to hold (and enjoy) one's own property and the question is whether defendants have violated that right of plaintiffs, which is the same right enjoyed by white citizens. Defendants' argument comes down to an assertion that plaintiffs are not entitled to the benefit of § 1982, because their usufructuary right to fish, hunt and gather is an unusually valuable right and one not available to non-members of the tribe. There is no merit to this assertion. Neither the relative values of property nor the particular nature of the property are relevant to the lawful owner's right to use and enjoy the property without illegally discriminatory interference. Just because a Van Gogh painting might be worth $10 million does not mean that its owner is not entitled to the protections of § 1982, that

is, to be free of discriminatory interference with his right to hold and enjoy his painting.

A prerequisite to recovery under § 1982 is a showing that the plaintiffs have been subjected intentionally to discrimination because of their ancestry or their ethnic characteristics. *See Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987); *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). Defendants contend that no such showing can be made here because the undisputed facts do not demonstrate that a racial animus has been the motivating factor in the defendants' efforts to prevent plaintiffs from exercising their treaty-protected usufructuary rights.

■ The initial question is whether race must be *the* motivating factor or merely *a* motivating factor. Defendants say race must be the sole motivation and cite *Stevens v. Tillman,* 855 F.2d 394 (7th Cir. 1988). However, *Stevens* makes no reference to the question and provides no guidance. *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977) held that at least where official action is involved, a plaintiff suing under § 1982 need prove only that "a discriminatory purpose has been a motivating factor in the decision." *See also Smith v. Sol D. Adler Realty Co.,* 436 F.2d 344, 349–50 (7th Cir. 1970): "race is an impermissible factor in an apartment rental decision" by private landlord that "cannot be brushed aside because it was neither the *sole* reason for discrimination nor the total factor of discrimination." (Emphasis in original). Defendants do not cite any case overruling *Arlington Heights* or *Smith,* and I can find nothing that suggests that § 1982's requirements have been changed to make it necessary to show that discrimination was *the* sole motivating factor for a defendant's interference with a plaintiff's property rights.

■ Plaintiffs have adduced compelling evidence of defendants' racially-motivated animus. Defendants mounted a caricature

of an Indian on the lectern at their largest rally. One member of Stop ·Treaty Abuse displayed a "Help Wanted" poster in his bar, seeking "Small Indians for use as mudflaps." Stop Treaty Abuse disseminated a brochure replete with stereotypical images of Indians as lazy, wasteful and receiving munificent welfare benefits. The brochure perpetuated the baseless rumor that Indian households receive $20,000 a year as a cost of living allowance.[7] It also gave currency to the unproved assertion that the Chippewa do not need the fish they spear for sustenance, but throw them away to rot after catching them. Stop Treaty Abuse members, including defendants Crist and Handrick, mocked Indian chants. By his own admission, Stop Treaty Abuse member Al Soik disparaged and held up for public ridicule the plaintiffs' spearing practices and characterized plaintiffs' assertions of the religious and cultural aspects of spearing as hypocritical.

Despite their assertions to the contrary, Stop Treaty Abuse and its members exhibit racist motives and actions in their opposition to Indian spearing. Perpetuating and encouraging stereotypes of persons as lazy or wasteful and ridiculing their religious and cultural practices are classic forms of racism that enable the perpetrators not only to rationalize the oppression of such people but to reinforce identification with the dominant group. *See generally*, Kimberle Crenshaw, *Race, Reform, and Retrenchment: Transformation and Legitimation in Antidiscrimination Law*, 101 Harv.L.Rev. 1331 (1988), and sources cited therein.

As I noted in the March 1991 order, it is disingenuous for defendants to argue that they are trying to prevent the Lac du Flambeau from spearing or gill netting only because they oppose those activities and not because they are biased against Indians in general. Defendants have not pointed to any other instance in which they have acted against a threatened harm to the fishing environment. It is impossible to escape the conclusion that it is the coalescence of a perceived harm *and* the minority source of that harm that produced the defendants' reaction. This is not unusual. Instances of racial discrimination rarely occur until and unless a minority group acts to exercise its rights. *See New York State NOW v. Terry*, 886 F.2d 1339, 1359 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990):

> In most cases of invidious discrimination, violations of constitutional rights occur only in response to the attempts of certain members of a class to *do* something that the perpetrators found objectionable.... It is sophistry for defendants to claim a lack of class-based animus because their actions are directed only against those members of a class who choose to exercise particular rights but not against class members whose actions do not offend them [citation omitted; emphasis in original].

### B. Sections 1985(3) and 1986

 Section 1985(3) reaches conspiracies formed for the purpose of depriving any person or class of persons of a constitutionally protected right. It provides no substantive right itself, but merely provides a remedy for the violation of rights. *Marino v. Bowers*, 657 F.2d 1363 (3d Cir. 1981). The rights must be federally protected ones to which the plaintiff is entitled

---

7. The statements in the brochure are the rural version of the "urban legends" that Jan Harold Brunvand writes about in "The Vanishing Hitchhiker," and "Curses! Broiled Again!" (1989). According to Brunvand, a distinguishing feature of an urban legend is that no one is ever able to produce an eyewitness to the actual event—only a "friend of a friend." Another is that the stories crop up over and over again, in many different settings. The same is true about the oft-repeated legend that the Chippewa receive allowances from the government of over $20,-000 a year. As plaintiffs point out, defendants

are unable to cite any provision in the law for such allowances.

Although defendant Crist was questioned at length about the sources of the statements in the brochure, he was uncertain about many of them and unable to identify any statement for which he had first-hand knowledge or as to which he had made any effort to confirm its accuracy, with the one exception that he claimed to have seen Japanese-manufactured outboard motors on some spearers' boats and "Made in Japan" or "Made in Korea" stamped on some spears.

to protection against anyone; not mere prohibitions against impairment by the state. *Cohen v. Ill. Institute of Technology*, 524 F.2d 818, 828 (7th Cir.1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976). For example, a private conspiracy to discriminate irrationally between similarly situated persons is not actionable. *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972). *See also United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983).

The federally protected right that plaintiffs claim to have been deprived of is their right to enjoy their property rights, a right guaranteed them under § 1982. Since I have already found that defendants violated plaintiffs' rights under that statute, there is no need to consider whether defendants might have conspired to do so. The act of conspiracy creates no additional liability in and of itself; it merely serves as a means of assessing liability against persons who may not have acted independently to violate plaintiffs' rights. Proving the existence of a conspiracy is unnecessary in this case, in which there is clear evidence of each defendant's liability for violation of § 1982.

The same analysis applies to plaintiffs' claim under § 1986, which covers persons who fail to prevent or aid in the prevention of the commission of wrongs conspired to be done, although they have power to do so.

### C. State Law Claims

It is unnecessary to consider whether plaintiffs have established defendants' violation of Wis.Stat. §§ 844.01(3) (interference with real property), 29.223 (interference with lawful fishing) and 813.125 (harassment), because I have found that they are entitled to an order granting them permanently the injunctive relief they were granted preliminarily in March 1991.

### D. Nature of Injunction

As I stated in the March 1991 order granting plaintiffs' motion for a preliminary injunction, the injunctive relief they seek is not intended to reach the defendants' verbal expression of their views. It is intended only to enjoin defendants from physical interference with plaintiffs' exercise of their treaty-protected fishing rights.

### ORDER

IT IS ORDERED that plaintiffs' motions to strike the supplementary brief and affidavit filed by defendants Stop Treaty–Abuse Wisconsin, Inc. and Dean Crist in opposition to plaintiffs' motion for summary judgment and to strike defendants' untimely motion for summary judgment are GRANTED; the motion of defendants Stop Treaty Abuse–Wisconsin, Inc. and Dean Crist for leave to file a second amended answer is DENIED; and plaintiffs' motion for summary judgment is GRANTED as to all of the named defendants.

The Clerk of Court is directed to enter judgment in favor of plaintiffs against defendants Stop Treaty Abuse–Wisconsin, Inc., Dean Crist and Tommy Handrick as follows:

Defendants Stop Treaty Abuse–Wisconsin, Inc., Dean Crist and Tommy Handrick and all those acting in concert with or at the direction of these defendants are enjoined permanently from

a) Assaulting or battering any member of the Lac du Flambeau band or any member of the family of a Lac du Flambeau band member at any landing or on any lake within the ceded territory;

b) Intentionally creating wakes on any waterway to interfere with any spearer;

c) Planting decoys in any waterway;

d) Intentionally blocking spearing boats from moving from the boat landings out to the spawning beds;

e) Shining lights into the eyes of any spearer or spearing boat operator while on the water;

f) Playing "leapfrog" with any spearing boat, or otherwise impeding the progress of any spearing boat; and

g) Taking any other action that is intended to or may reasonably be expected to interfere with plaintiffs' exercise of their spearing rights, including blowing whis-

tles at spearers or any members of their families.

FURTHER, IT IS ORDERED that this action is dismissed with respect to "unknown John Does and Jane Roes" for plaintiffs' failure to identify and serve these defendants.