991 F.2d 1249
 LAC du FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS,
Michael Allen, Wa-Swa-Gon Treaty Association,
Thomas Maulson, Robert Martin, Nick
Hockings, and Gilbert Chapman,
Plaintiffs-Appellees,
v.
STOP TREATY ABUSE-WISCONSIN, INC., and Dean Crist,
Defendants-Appellants.
 Nos. 92-1315, 92-2672[1].
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 11, 1992.
Decided April 14, 1993.
As Corrected April 26, 1993.
 
 1
 Brian L. Pierson (argued), Hall, First & Patterson, Milwaukee, WI, Kathryn L. Tierney, Lac du Flambeau, WI, for plaintiffs-appellees.
 
 
 2
 William A. Schroeder (argued), Richard E. Sommer, Sommer, Olk, Schroeder & Payant, Rhinelander, WI, for defendants-appellants.
 
 
 3
 Before BAUER, Chief Judge, MANION, Circuit Judge, and MOODY, District Judge.[2]
 
 
 4
 MOODY, District Judge.
 
 
 5
 In this consolidated appeal, Dean Crist and Stop Treaty Abuse-Wisconsin, Inc. ("STA") appeal from the district court's judgment granting permanent injunctive relief to plaintiffs-appellees on a claim under 42 U.S.C. § 1982, and entry of judgment for fees and costs to plaintiffs-appellees pursuant to 42 U.S.C. § 1988. They also seek reversal of several interlocutory decisions made by the district court. We affirm the interlocutory decisions, but find the district court erred in granting summary judgment when it resolved a disputed issue of material fact against STA and Crist--whether STA and Crist's harassment of plaintiffs-appellees was racially-motivated. Thus, we reverse the district court's order granting summary judgment, vacate both final judgments, and remand for further proceedings consistent with this opinion. On remand, the preliminary injunction that was granted by the district court is reinstated.
 
 I. FACTS
 
 6
 The Lac du Flambeau Band of Lake Superior Chippewa Indians ("LDF") is one of the several Chippewa bands which possess treaty-retained usufructuary rights to engage in off-reservation hunting, fishing, trapping and gathering on public lands in the northern third of Wisconsin. The existence and exercise of these usufructuary rights has been controversial. Another panel of this court affirmed the present vitality of the treaties and concomitant ability of the Chippewa to exercise the rights in Lac Courte Oreilles v. Voigt, 700 F.2d 341, appeal dismissed and cert. denied sub nom. Besadny v. Lac Courte Oreilles, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). In the present case plaintiffs-appellees seek to enjoin interference with their exercise of fishing rights. Plaintiffs-appellees are the LDF, suing on behalf of all of its members, the LDF's president, a treaty support group and four individual LDF members who engage in off-reservation fishing.[3]
 
 
 7
 Dean Crist is a Wisconsin resident who believes, to put it mildly, that we decided Voigt wrongly. He is concerned mainly with the right of the Chippewa to take fish by spear and by net: highly efficient fishing methods prohibited by law for all other anglers. According to Crist, at the time the treaties were entered into, the Chippewa used primitive equipment to spear fish: hand-paddled birchbark canoes, fragile, hand-carved wooden spears and flaming torches. This made the harvest of fish difficult, and the number taken few. Now, aluminum fishing boats powered by outboard motors are used. Sealed beam automobile headlamps carried in the boats provide illumination, and metal-tined spears minimize lost time due to breakage.
 
 
 8
 These modern conveniences, unknown when the treaties were formed, make the treaties invalid, Crist believes, or are at least a reason why the treaties should be abrogated. Crist's beliefs are explained at length in a pamphlet he authored for STA entitled "Wisconsin's Treaty Problems--What Are The Issues?" The pamphlet also serves to explain in part STA's corporate purpose.
 
 
 9
 STA is a for-profit Wisconsin corporation formed by Crist and others who share his disgust with the Voigt decision and object to treaty rights, especially spearing. Crist occupies the position of "spokesman" in the STA organizational structure.[4] STA encourages "boat landing protests" at off-reservation sites where LDF members spear. According to the STA pamphlet written by Crist, the protests are for the purpose of "send[ing] the message to Madison and Washington, D.C. that we need the treaty problems in Northern Wisconsin resolved." Crist engages in activities, which STA encourages, to "save fish" by interfering with the LDF's spearing. The line separating protesting from saving fish is imperceptible.
 
 
 10
 The protesting/fish saving which caused the LDF to seek an injunction has not been peaceful. Protestors, some of whom are associated with STA but many of whom are perhaps not,[5] have harassed the LDF to make spearing unpleasant, dangerous and/or impossible. The district court's order granting summary judgment provides a comprehensive description of the harassment. Lac du Flambeau v. Stop Treaty Abuse-Wisconsin, Inc., 781 F.Supp. 1385 (W.D.Wis.1992). In brief, the protestors blew steel whistles (obtainable in a "protest kit" sold by STA) directly into the ears of LDF spearers and their accompanying family members and friends. The protestors crowded landings to make launching boats difficult, and, for the same purpose, formed flotillas of boats around the landings. They operated their boats in a manner intended to create wakes so that LDF members could not stand in their boats to spear. STA sponsored a contest to encourage production of concrete fish decoys which could be used to cause damage to the metal spears. On occasion, rocks were thrown at the spearers.
 
 
 11
 Not satisfied merely with physically interfering with the spearing, the protestors also injected racism into the harassment. They hurled vile racial insults, such as "timbernigger" and "welfare Indian" at the spearers, chanted "hi-how-are-ya" to the beat of tom-toms and engaged in other mockery of Indian culture and tradition. The STA pamphlet authored by Crist contains bigoted racial stereotypes; for example, that each year "thousands" of fish caught by the spearers spoil because of "the lack of ambition to clean them." At a STA-sponsored rally, the speaker's podium featured an unflattering caricature of an Indian.
 
 II. PROCEEDINGS BELOW
 
 12
 On February 1, 1991 the LDF filed suit seeking a permanent injunction to stop STA's interference with LDF fishing, asserting claims under 42 U.S.C. §§ 1982, 1983, 1985(3), 1986 and pendent state claims under Wis.Stat. §§ 844.01, 29.223 and 813.125. No damages were sought, only injunctive relief. The LDF also moved for a preliminary injunction when the complaint was filed.
 
 
 13
 On March 4 STA moved that the district judge disqualify herself due to prior involvement in the Voigt litigation and requested a jury trial. The judge heard the motion for disqualification on March 5, orally denied it at the hearing, and entered a written order of denial on March 6. On March 7 the judge conducted a hearing on the LDF's motion for a preliminary injunction. On March 15 the preliminary injunction was granted. Lac du Flambeau v. Stop Treaty Abuse-Wisconsin, Inc., 759 F.Supp. 1339 (W.D.Wis.1991).[6] STA did not appeal from the preliminary injunction.
 
 
 14
 On October 2 STA moved to amend its answer to assert a new defense. On October 15 the LDF moved for summary judgment on each of its claims. On October 31 the judge conducted a motion hearing and denied STA's motion to amend and earlier request for a jury trial. STA's request for additional time to file a responsive brief to the LDF's motion for summary judgment was granted.
 
 
 15
 Despite the additional time, after briefing on the motion was complete, STA on December 2 sought leave to file a supplemental response to the motion for summary judgment. The LDF moved to strike the supplemental response. On December 24 STA again sought leave to amend its answer, this time to include the additional defense raised in the supplemental response as well as the defense raised in the previously-denied motion to amend.
 
 
 16
 In an order dated January 6, 1992 the district judge granted the motion to strike the supplemental brief, denied the motion for leave to amend, granted summary judgment on the LDF's § 1982 claim, and ordered entry of final judgment granting permanent injunctive relief. 781 F.Supp. at 1395. Because the district court was able to grant complete relief by deciding only the § 1982 cause, the other LDF claims were dismissed. On January 27, 1992 a final judgment permanently enjoining STA from interfering with the LDF's exercise of fishing rights was entered, with terms identical to the preliminary injunction. 781 F.Supp. at 1395-96. A separate judgment for fees and costs was entered on July 17, 1992 in favor of the LDF as a prevailing party pursuant to 42 U.S.C. § 1988.III. ANALYSIS
 
 
 17
 STA argues that several interlocutory decisions made by the district court were erroneous and require reversal, as does the district court's order granting summary judgment, making it necessary to vacate the final judgments entered against STA. The issues raised are: 1) whether the district court abused its discretion in denying STA's request for a jury trial, 2) whether the district court abused its discretion in denying STA's motion for disqualification, 3) whether the district court abused its discretion in refusing to allow STA leave to file an amended answer and supplemental response to the LDF's summary judgment motion, 4) whether usufructuary fishing rights are "property" within the meaning of that term under § 1982, 5) whether affidavits filed in support of the LDF motion were so deficient as to preclude a grant of summary judgment, 6) whether the district court's holding impermissibly restricts speech, in violation of first amendment (as explained below, a somewhat incomprehensible argument), 7) whether disputed issues of material fact precluded summary judgment, and 8) whether the LDF is a "prevailing party" entitled to attorneys' fees or whether the cost and fees awarded are excessive.
 
 
 18
 We find that the grant of summary judgment must be reversed, which requires vacating the judgment for fees making the issues raised in that appeal moot. The interlocutory issues raised in the appeal from the decision on the merits are not moot, however, and we address them to avoid needless proceedings on remand. Weir v. Propst, 915 F.2d 283, 286 (7th Cir.1990). We turn first to the issues collateral to the merits of the § 1982 cause of action.
 
 A. STA's Right to a Jury Trial
 
 19
 STA's argument that the district court abused its discretion by denying STA's request for a jury trial is so cursory it borders on being frivolous. In this action the LDF sought only an injunction, no monetary damages. It is beyond question that a right to a jury trial does not attach to actions seeking only equitable relief. United States v. Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950). We have had little success in locating any decision where this principle has been questioned; STA's research efforts apparently fared no better.
 
 
 20
 Citing no authority,[7] a violation of Fed.R.App.P. 28 and reason alone to reject the argument, STA argues that the award of attorneys' fees available to plaintiffs who succeed under § 1982 is a "de facto award of damages." The size of the potential award in the present case, STA argues, should have been "recognized as justification" by the district court "to exercise discretion" to allow a jury trial. STA's failure to make this argument in the district court is waiver, as is its failure to develop the argument before us. Wigod v. Chicago Mercantile Exchange, 981 F.2d 1510, 1519 (7th Cir.1992); Churchill v. Waters, 977 F.2d 1114, 1120 n. 6 (7th Cir.1992); United States v. Berkowitz, 927 F.2d 1376, 1384 (7th Cir.1991).
 
 
 21
 The absence of support for STA's argument is telling, and we choose not to do STA's research work. Given the LDF's non-acquiescence to the jury demand and the language of Fed.R.Civ.P. 39, it is doubtful the district court even had discretion to allow a jury trial. Besides, we flatly disagree with the logic of STA's position. "Abuse of discretion" is a highly deferential standard of review, applied by an appellate court to a district court's decision only if it is "fundamentally wrong." Anderson v. United Parcel Service, 915 F.2d 313, 315 (7th Cir.1990). Not exercising discretion is not the same as exercising discretion abusively. It would be an extremely unlikely event, we think, to reverse a judge for failing to "recognize a justification" to exercise discretion in the first place. Hypothesizing aside, this is not that event.B. STA's Motion for Disqualification
 
 
 22
 The district court also did not abuse its discretion in denying STA's motion for disqualification. STA moved for disqualification pursuant to 28 U.S.C. §§ 455(a) and (b)(1). Subsection (a) requires disqualification where "impartiality might reasonably be questioned;" subsection (b)(1) where the presiding judge has "personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."
 
 
 23
 STA's appellate brief does not indicate whether it disagrees with the district court's ruling under one or both of the subsections, but appeal of the decision under subsection (a) does not fare well. The rule in this circuit is well-established that a party moving for disqualification under § 455(a) must immediately move for a writ of mandamus in the event the district judge denies the motion. United States v. Towns, 913 F.2d 434, 443 (7th Cir.1990) (collecting cases). That having not been done here, the argument is waived, and we give it no further consideration. Id.
 
 
 24
 Appeal of a denial of a motion under subsection (b)(1) is not preconditioned on a writ of mandamus, however, so we proceed. Appellate review of the district judge's decision regarding disqualification under (b)(1) is de novo; the question is whether a reasonable person would be convinced the judge was biased. Taylor v. O'Grady, 888 F.2d 1189, 1201 (7th Cir.1989); United States v. Balistrieri, 779 F.2d 1191, 1202 (7th Cir.1985), cert. denied sub nom. DiSalvo v. United States, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986). In this case, to ask this question is to answer it.
 
 
 25
 STA's argument that the district judge had "personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts" is simple: due to previous involvement in the Voigt case and many other cases involving treaty rights, the judge must be biased against anyone protesting against the existence of those rights. STA also argues that in the Voigt litigation the district judge found as fact that Chippewa spearers had been subjected to violent and lawless acts by "protestors." STA believes this is personal knowledge of a fact disputed in this litigation, or at least a suggestion of potential bias or prejudgment by the district judge that they, as admitted protestors against spearing, had themselves engaged in the acts in question.
 
 
 26
 During a telephonic hearing on the motion for disqualification, the district judge stated:
 
 
 27
 The findings I made in June of 1989 [in the Voigt case] were directed to the facts that were in front of me at that time. I found that there were some actions by some protestors that were as I described. I didn't make findings that those protestors were specific individuals, that they were members of specific groups. Even if I had, I don't think that would make any difference at this time. But I didn't.... what I found in June 1989 is probably completely irrelevant ... I'm certainly not going to go back to any of my notes from 1989. This is a different case. These are different lawyers. They are going to be putting in proof on Thursday [at the hearing on the motion for a preliminary injunction] which is going to be the basis for the rulings. And I will focus my rulings solely on the proof that is before me on Thursday and not on anything else that may have gone on in another lawsuit that is tangentially related to this one.
 
 
 28
 Tr. of hearing, Mar. 5, 1991, pp. 9-10. The following day the district court entered a written order denying the motion to disqualify finding that "moving defendants adduced no evidence of bias that would lead a reasonable person to question my impartiality in this hearing." Coupled with the judge's earlier comments at the close of the hearing, it is clear that the judge felt she had no personal knowledge of facts in issue, or actual or apparent bias.
 
 
 29
 "Personal" knowledge of evidentiary facts means "extrajudicial." Balistrieri, 779 F.2d at 1202. Facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification. United States v. Patrick, 542 F.2d 381, 390 (7th Cir.1976), cert. denied, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977). That being the case, it is difficult to imagine how judicially-learned facts about different parties in a case similar to the one being tried would require disqualification. The district judge made it clear that she did not link the activities of STA and its members to protestor activities she had previously heard evidence of in Voigt. No reasonable person would believe the judge personally biased in these circumstances, and denial of the motion to disqualify was not an abuse of discretion.
 
 
 30
 C. Amendment of Answer and Filing of Supplemental Response
 
 
 31
 STA sought leave to file a supplemental response to the LDF motion for summary judgment, and twice sought leave to amend its answer. STA desired to assert two additional defenses. First, that the treaty-retained usufructuary rights no longer exist, due to certain Indian Claims Commission ("ICC") findings made prior to our decision in Voigt that compensation had been paid to the LDF to extinguish them. Second, that some plaintiffs and LDF members lack the requisite Indian ancestry necessary to qualify under the treaties to exercise the rights, thus lacking standing in this action. The district court denied STA's requests for leave to amend its answer to raise these defenses, and granted the LDF's motion to strike a supplemental response to its summary judgment motion raising the ICC defense. The district court found that STA had not raised the defenses in a timely manner. Further, the district court found the defenses meritless, our decision in Voigt having conclusively determined the existence of the rights and identity of the parties entitled to exercise the rights.
 
 
 32
 On appeal, STA argues at length that Voigt is not a res judicata bar to these defenses and therefore the district judge committed reversible error in not allowing the amendments. STA urges us to conduct a de novo review, res judicata being a question of law. However, STA makes no convincing argument why the district judge abused her discretion in not allowing the amendments and supplemental brief due to their untimeliness. That alone is reason to deny STA's appeal of this issue, and avoids discussion of its convoluted arguments regarding res judicata, which, in any event, we find an unpersuasive collateral attack on our earlier decision in Voigt. See Nevada v. United States, 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983).
 
 
 33
 The timing of the disallowed filings was as follows. Early in the case the district judge entered a scheduling order, requiring all amendments to the pleadings to be made by July 1, 1991, and all dispositive motions to be filed by October 1, 1991. On October 2, 1991 STA filed its motion for leave to amend its answer to assert the standing defense, three months after the date for final amendments to the pleadings, one day after the deadline for filing dispositive motions,[8] and only four months prior to the scheduled trial. On November 5 the district court denied the motion because it was untimely and meritless.
 
 
 34
 On December 2, a week after filing its response to the LDF's summary judgment motion and after the LDF filed its reply brief, STA sought to file a supplemental responsive brief raising the issue of the ICC orders. The LDF moved to strike the supplemental brief. On December 24 STA sought leave to amend its answer to include this issue and again the standing defense: this was one month after briefing of the summary judgment motion was complete, and only six weeks prior to trial. In its order of January 6, 1992 granting summary judgment to the LDF, the district court granted the LDF's motion to strike and denied STA's motion for leave to amend, on grounds of untimeliness and because the additional defenses were meritless.
 
 
 35
 A district court's decision to deny leave to amend a pleading after deadlines for final amendments and for filing dispositive motions have passed is reviewed only for abuse of discretion. Campbell v. Ingersoll Milling Machine Co., 893 F.2d 925 (7th Cir.), cert. denied, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). The district court will be reversed only if no reasonable person could agree with its decision. United States v. $103,387.27, 863 F.2d 555 (7th Cir.1988). As to the "supplemental" brief in response to the summary judgment motion raising for the first time the ICC defense, a "decision to disregard all materials submitted after a reasonable filing deadline is certainly not an abuse of discretion because it allow[s] the district court to preserve the moving party's right to respond to the resisting party's argument and to decide the summary judgment motion in a timely fashion." Pfeil v. Rogers, 757 F.2d 850, 858 (7th Cir.1985), cert. denied, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).
 
 
 36
 STA's only excuse for raising the additional defenses so late in the proceedings goes only to the ICC defense, and is that research necessary to raise the issue required a difficult and time-consuming search of the National Archives. STA brought this to the district court's attention for the first time on December 24, 1991 when responding to the LDF's motion to strike the supplemental brief. By affidavit, STA's counsel informed the court he had only become aware of the potential defense in late August or early September 1991, and had raised the defense in as timely a manner as possible.
 
 
 37
 However, STA's counsel did not explain why the defense could not have been discovered earlier, nor why he had not immediately sought to amend or to extend the deadlines for filing dispositive motions, concluding discovery or continuing the trial date. The LDF was of course prejudiced by the delay, as the new defenses were not addressed in its timely October 1 motion for summary judgment. In the absence of the defenses, the motion was potentially dispositive of the litigation. As a result, we cannot say the district court abused its discretion in refusing to allow such untimely amendments and the supplemental brief.
 
 
 38
 D. Summary Judgment for the LDF on § 1982 Claim
 
 
 39
 Enacted as part of the Civil Rights Act of 1871, 42 U.S.C. § 1982 guarantees to all citizens of the United States "the same right ... as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property." 42 U.S.C. § 1982. To prove a violation of § 1982, a plaintiff must demonstrate 1) interference with property rights, which interference is 2) motivated by racial prejudice. Shaare Tefila Congregation v. Cobb, 481 U.S. 615, 616, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1987). Racial prejudice need not be the sole motivating factor but must be more than an insubstantial factor bearing on the decision: but for the prejudice, the interference would not have occurred. Bachman v. St. Monica's Congregation, 902 F.2d 1259, 1262-63 (7th Cir.1990); Smith v. Sol D. Adler Realty Co., 436 F.2d 344, 349-50 (7th Cir.1971). The essence of the LDF's cause under the statute is that STA and Crist are not motivated to protest against spearing due purely to concern over conservation of natural resources, but instead because of racial prejudice against American Indians. Thus, the LDF members are being deprived of their right to hold property--enjoy the use of the treaty-retained fishing right--because of their race. STA and Crist deny any race-based animus.
 
 
 40
 The LDF, in order to obtain summary judgment, was required to demonstrate the absence of any disputed issue of material fact, and show that on those undisputed facts it was entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the district court's decision, we act de novo and apply the same standard used by the district court, affirming only if, after viewing the record and all reasonable inferences to be drawn from it in the light most favorable to the party opposing the motion, the movant must prevail as a matter of law. Sands, Taylor & Wood Co. v. The Quaker Oats Co., 978 F.2d 947 (7th Cir.1992). In this case, that requires finding that STA and Crist's racial animus is an undisputed fact.
 
 
 41
 Due to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually not appropriate for summary judgment. Kincaid v. Vail, 969 F.2d 594, 602 (7th Cir.1992), cert. denied sub nom. Sceifers v. Vail, --- U.S. ----, 113 S.Ct. 1002, 122 L.Ed.2d 152 (1993); Adler v. Madigan, 939 F.2d 476, 479 (7th Cir.1991); Rakovich v. Wade, 850 F.2d 1180, 1205 n. 17 (7th Cir.1988); Egger v. Phillips, 669 F.2d 497, 502 (7th Cir.1982), reh'g granted on other grounds, 710 F.2d 292 (7th Cir.), cert. denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).
 
 
 42
 1. Are Usufructuary Rights "Property?"
 
 
 43
 Irrespective of its motivation, STA argues that treaty-retained usufructuary fishing rights are not "property" within the meaning of 42 U.S.C. § 1982. STA made the same argument in district court in opposition to the LDF motion for a preliminary injunction. In its well-reasoned treatment of the issue, the district court cited our earlier discussion in Voigt, which likened the interest to a profit a prendre. 700 F.2d at 352; 759 F.Supp. at 1350. Relying as well on the definition of "property" under Wisconsin statutory law, Wis.Stat. § 840.01, the district court held that the usufructuary right to spear fish is a property interest protected by § 1982.
 
 
 44
 STA's argument in opposition to the preliminary injunction ended its litigation of this issue in the district court. In its response to the LDF's motion for summary judgment, STA chose not to object to the LDF's showing on this element of its prima facie case. To the contrary, STA's entire argument consisted of two concessionary sentences: "In order for plaintiffs to make their case, they must show they possess a property right protected by 42 U.S.C. § 1982. The court has previously held that the treaty rights are such."
 
 
 45
 The court's previous holding, being a decision on a motion for a preliminary injunction, was itself only preliminary and subject to revision at any time. Gould v. Lambert Excavating, Inc., 870 F.2d 1214, 1218 (7th Cir.1989); Communications Maintenance v. Motorola, 761 F.2d 1202, 1205 (7th Cir.1985); LTD Commodities, Inc. v. Perederij, 699 F.2d 404, 407 n. 6 (7th Cir.1983). In fact, we have advised district courts to be cautious in adopting conclusions of law made in ruling on a preliminary injunction because the posture of the case at that time inevitably entails incomplete evidentiary materials and hurried consideration of the issues. Motorola, 761 F.2d at 1205. Caution is also necessary because a motion for summary judgment raises a different decisional question for the judge than does a motion for a preliminary injunction.
 
 
 46
 Consideration of the former requires the judge to inquire whether there is any issue of material fact when the facts and inferences therefrom are viewed most favorably to the non-movant; the latter, whether there is a reasonable likelihood the moving party will prevail on the merits. Id. Thus, when the LDF moved for summary judgment, it was incumbent on STA to present its best arguments to the district judge, who was not only free, but more properly put, obliged, to reconsider each of her decisions on the motion for preliminary injunction.
 
 
 47
 By not making any argument in response to the LDF's showing that the usufructuary right is a property interest, instead conceding the issue, STA deprived the district court of the opportunity to fully explore the matter and waived this argument for appeal purposes. We consistently hold that arguments not made in the district court are waived. Wigod, 981 F.2d at 1519. This case presents no reason to deviate from that rule. A party responding to a motion for summary judgment is being put to its proof; if it chooses to concede the propriety of an earlier, non-binding ruling in the case, it must live with the effect of its concession.
 
 
 48
 2. Were the Affidavits Deficient?
 
 
 49
 Affidavits used to support a motion for summary judgment must be made on personal knowledge and set forth facts that would be admissible as evidence at trial. Fed.R.Civ.P. 56(e). STA argues that the district court's findings in this case were based almost exclusively on affidavits unacceptable because riddled with conclusory statements and hearsay. Without the affidavits, STA argues, there is insufficient evidence to establish that harassment, racist or otherwise, ever impeded the LDF's ability to fish, or that racism motivated the harassment.
 
 
 50
 The problem with this argument is that STA did not object to the affidavits when responding to the motion for summary judgment. Because it was not presented to the district court, the argument is waived. Wigod, 981 F.2d at 1519. STA argues in its reply brief in this court that it objected to the affidavits at the hearing on the motion for a preliminary injunction.
 
 
 51
 As discussed above regarding the issue whether the treaty right to spear fish is "property," objecting at the preliminary injunction hearing but not in responding to the motion for summary judgment does not preserve the argument. Also, additional affidavits supported the motion for summary judgment that were not used as evidence for the preliminary injunction. Moreover, the "objection" STA's counsel made at the hearing was cursory:
 
 
 52
 I have only read a few of these [affidavits], because we just got them, this last batch. We would make objection to the form of some of those affidavits as some of the averments are on information and belief, some are conclusionary, and I make a motion to strike those. But I don't know that that's necessary if you are going to take account of all that when you read it.
 
 
 53
 Tr. of hearing, March 7, 1991, pp. 6-7.
 
 
 54
 That was STA's only objection. STA did not seize its opportunity when responding to the motion for summary judgment to point out to the district court the objectionable portions of the affidavits, nor has it done so on appeal. While our job on summary judgment is to review the entire record de novo, we will not wade through every affidavit and make each of STA's objections for it. Friedel v. City of Madison, 832 F.2d 965, 969 (7th Cir.1987). Neither do we expect the district court to sift through the affidavits and separate wheat from chaff. Cf., In re Central Ice Cream Co., 836 F.2d 1068, 1074 (7th Cir.1987) (district court not required to examine voluminous time records to "rescue the compensable time from the sea of non-compensable hours.").
 
 
 55
 Thus, we do not disagree at all with the district court's conclusion that the record contains ample undisputed facts demonstrating that the
 
 
 56
 purpose of the on-water protests and the protests at the boat landings was to stop the plaintiffs' exercise of their right to engage in off-reservation spearing of walleye and muskellunge. The goal of Stop Treaty Abuse-Wisconsin has been to stop the plaintiffs from exercising their treaty recognized right to spear fish, by doing everything in its power to stop plaintiffs' spearing.
 
 
 57
 781 F.Supp. at 1390 (footnote omitted.) We also agree with the district court's conclusion that the record contains undisputed evidence that "Stop Treaty Abuse and its members exhibit racist ... actions in their opposition to Indian spearing." 781 F.Supp. at 1394. Our disagreement with the district court, as explained below, is over whether the evidence of racist actions establishes beyond dispute a racist motivation for STA's harassment of the LDF spearers.
 
 
 58
 3. Does the Judgment Conflict With the First Amendment?
 
 
 59
 STA argues that the district judge committed an error of law in considering expression protected by the first amendment evidence of racial animus, echoing the district judge's own recognition when granting the preliminary injunction that "even vile, loathsome and hateful statements may be protected under the First Amendment." 759 F.Supp. at 1354. STA's argument on appeal is not well-developed, difficult to comprehend, and veers off on a different tack in the reply brief than in the opening brief.
 
 
 60
 In its opening brief, the gist of STA's argument seems to be that inflammatory speech, such as racial slurs, because protected by the first amendment, can never serve as evidence of racial animus. Taking STA's argument to its logical conclusion, the statement "I'm refusing to hire you because you are black and I think all blacks are inferior" would not be admissible evidence of discriminatory hiring. This is patent nonsense.
 
 
 61
 While the first amendment in fact does preserve the right to speak offensively, it does not provide a shield against the logical import of that speech. Using the allowed speech as evidence of a prohibited action does not negate the right to so speak. Conduct may be prohibited, even if the conduct is evidenced or carried out by speech, without abridging the right of free speech. Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). It bears keeping in mind that even if the LDF does eventually prevail, injunctive relief will not prevent STA members from shouting racist invective at spearing sites, only from engaging in racially-motivated activity that interferes with the fishing.
 
 
 62
 Perhaps admitting the utter baselessness of this argument, STA asserts in its reply brief that the terms of the district court's injunction unlawfully restrict its first amendment right to engage in political protest, since it "is apparent that ... any attempt to ... demonstrate opposition, even if conducted in total silence, could be interpreted as [violating the injunction.]" We do not consider arguments omitted from an opening brief raised only in a reply brief. Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1441 n. 5 (7th Cir.1992); Reynolds v. East Dyer Development Co., 882 F.2d 1249, 1253 n. 2 (7th Cir.1989). Moreover, because we are reversing and remanding to the trial court for further proceedings, it is not certain the same permanent injunction, or any at all, will be entered.[9] We do not mean to suggest, however, that we agree at all that the terms of the injunction are flawed.
 
 
 63
 4. Do Disputed Issues of Material Fact Preclude Summary Judgment?
 
 
 64
 The main issue raised by this appeal, upon which we find it necessary to reverse, is whether the undisputed material facts establish as a matter of law that STA's harassment of the LDF spearers was motivated by the race of the spearers. STA and Crist contend that race was irrelevant; the sole motivation was a desire to "save fish."[10] The district judge found that racist statements made by STA and its members, as well as the harassment in and of itself, established as a matter of law that STA was motivated by racism. We agree with the district court that the evidence of racism in this case is strong evidence of a racist motive: our disagreement is confined solely to whether STA produced evidence sufficient to place that motive in dispute. Our inquiry focuses on whether the district judge was entitled to disbelieve STA's evidence that it was not motivated by racism. Fundamentally, the issue is whether racist acts conclusively demonstrate racist motivation.
 
 
 65
 For the purposes of this discussion, there is no need to elaborate on our earlier description of the evidence of racism in the record; it is ample.[11] However, the record also contains evidence indicating that this racism may have been an undesired component of STA's protest activities, unrelated to the legitimate, non-discriminatory motives proffered by STA. In Crist's affidavit opposing summary judgment he denies racist motivation, or, for that matter, ever having uttered the racial slurs attributed to him in the affidavits of others. STA passed out "Protesting Policy" flyers at STA-encouraged protests that state in part:
 
 
 66
 STA/WIS only supports peaceful protests. The following 5 points are not peaceful and are not acceptable behavior. Please do not engage in the following:
 
 
 67
 DO NOT ...
 
 
 68
 1. carry signs containing racial slogans.
 
 
 69
 2. shout racial or obscene remarks.
 
 
 70
 At one protest, Crist publicly condemned as racist a protestor's display of an Indian-head effigy impaled on a spear.
 
 
 71
 Nevertheless, the district judge found the evidence of racial motivation undisputed: "Despite their assertions to the contrary, Stop Treaty Abuse and its members exhibit racist motives and actions in their opposition to Indian spearing." 781 F.Supp. at 1394. The seeds of our difficulty lie here, in the district judge's casting aside of STA and Crist's "assertions to the contrary" regarding motivation. In essence, the district judge concluded either that the proffered non-discriminatory motives were pretextual, or at least insufficient to rebut the LDF's showing of racial motivation to the degree necessary to put motive in dispute. This conclusion departs from our oft-repeated observation that evidence of mixed motives is "ordinarily not grist for the summary judgment mill." Adler, 939 F.2d at 479.
 
 
 72
 Concluding that racism was a motivating factor necessarily means that the district judge disbelieved the affidavits filed by Crist and other STA officers denying racial motivation. Relying solely on affidavits to determine issues of motivation and intent is not a recommended course. Dahnke v. Teamsters Local 695, 906 F.2d 1192, 1196 (7th Cir.1990). Our repeated references to this truism are often found in explanations why defendants' affidavits denying an improper motive do not usually entitle them to summary judgment. See, e.g., Egger, 669 F.2d at 502.
 
 
 73
 Such affidavits may be enough, however, to make motivation a disputed fact, requiring denial of a summary judgment against a defendant. Given that the party opposing a summary judgment motion is entitled only to every reasonable, as opposed to conceivable, inference, Spreen v. Brey, 961 F.2d 109, 111 (7th Cir.1992), the question becomes whether any finder of fact, in the given circumstances, would believe the denial of racist motive. If so, the denial creates a genuine issue of fact requiring trial to ascertain the credibility of the affiants, discern the truth of the facts alleged in the affidavits and resolve the factual dispute. Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir.1991); Santiago v. Lane, 894 F.2d 218, 223-24 (7th Cir.1990).
 
 
 74
 In addition to affidavits of Crist and other STA officers denying a racial animus, other evidence in the record, such as the printed STA "Protesting Policy," lends an air of reasonableness to the denial. Thus, we disagree with the district judge that evidence of racist motivation is undisputed. In so doing, we admit the facts of this case make this an extremely close call, and require an answer to an obvious question: how can the many racist acts evident in the record not constitute undisputed evidence that racism motivated the harassment?
 
 
 75
 Our disagreement with the district judge's resolution of this question is disturbing because it is based in part upon recognition of an ugly truth: we live in a society in which racism is pervasive and racial slurs are common. Casual attention to the daily news is a constant reminder. Minor traffic accidents escalate into racial incidents as tempers flare; the owner of a major league baseball team refers to her players as "million-dollar niggers" and justifies the remark by explaining that she was only joking.
 
 
 76
 The frequency and casualness with which racial slurs are used and the complexities of human behavior make it possible, we think, that racist conduct accompanying a particular behavior does not necessarily mean that the behavior was racially motivated. Consider a hypothetical member of a group committed to protesting against wearers of fur coats. This protestor also happens to be virulently racist against blacks. At a demonstration outside a fur salon, the protestor discovers that the salon's proprietor is black. It seems highly unlikely that the protestor would refrain from making racially derogatory remarks. Whether the remarks are due to a lack of self-control, are an attempt to make the protest even more unpleasant for the furrier, or are spoken because they increase the protestor's personal satisfaction, it is clear that racism was not a factor motivating the protest.
 
 
 77
 The present case is similar--albeit not identical, as STA knows the spearers will always be Indians--in that STA asserts that it is motivated by its desire to "save fish." This is not an absurd argument: the district judge admitted in ruling on the preliminary injunction that it has "some surface plausibility." 759 F.Supp. at 1349. Years of litigation by the state of Wisconsin in Voigt opposing the same treaty rights STA opposes also indicates that reasons other than racism may motivate STA. There is no dispute that unregulated spearing could detrimentally impact the fish population.
 
 
 78
 The district judge found STA's environmental concerns to be a pretext for discrimination, however, remarking:
 
 
 79
 [I]t is disingenuous for defendants to argue that they are trying to prevent the Lac du Flambeau from spearing or gill netting only because they oppose those activities and not because they are biased against Indians in general. Defendants have not pointed to any other instance in which they have acted against a threatened harm to the fishing environment. It is impossible to escape the conclusion that it is the coalescence of a perceived harm and the minority source of that harm that produced the defendants' reaction.
 
 
 80
 781 F.Supp. at 1394.
 
 
 81
 We think this reasoning improperly shifts the burden of proof on summary judgment. It is not STA's burden to establish a track record of ecological protest. It instead is the LDF's burden to prove that STA's interference with spearing was improperly motivated. Viewing the evidence most favorably to STA, as we must when reviewing a grant of summary judgment, the fact that this is the first encroachment against fish that moved STA to protest may not be disbelieved because of no evidence of other protests.[12]
 
 
 82
 The second, and prime, reason why the district judge found the "save fish" argument to be a pretext for discrimination was based on her observation that racial discrimination is unlikely to occur until an individual seeks to exercise a right, e.g., the right of a black person to move into a neighborhood populated entirely by whites. In support of this reasoning, the district judge cited an analogous opinion by the Court of Appeals for the Second Circuit in New York State NOW v. Terry, 886 F.2d 1339 (2d Cir.1989), cert. denied, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990). Terry involved protests held at abortion clinics, alleged by plaintiffs to be part of a conspiracy by defendants to deprive women of their constitutional rights thereby violating 42 U.S.C. § 1985(3).
 
 
 83
 The defendants in Terry argued they were motivated solely by opposition to abortion, but the court found that an animus against women in general could be presumed from the protests:
 
 
 84
 It is sophistry for defendants to claim a lack of class-based animus because their actions are directed only against those members of a class who choose to exercise particular rights but not against class members whose actions do not offend them.
 
 
 85
 Id. at 1359. Citing this passage from Terry because of the obvious similarity between the "save fish" and "save unborn children" defenses, the district court found STA's fish-saving motivation insufficient to make motivation a disputed fact and defeat the LDF's motion for summary judgment.
 
 
 86
 While not repudiating the logic in all circumstances that animus against a group can be presumed from protest directed at that group, the Supreme Court's recent decision in Bray v. Alexandria Women's Health Clinic, --- U.S. ----, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) requires us to examine the application of the proposition to the present facts critically. Bray, like Terry, was an action under § 1985(3) where plaintiffs argued that an animus against women is demonstrated by protest against abortion. The Court rejected this reasoning:
 
 
 87
 [R]espondents' contention that a class-based animus has been established can be true only if one of two suggested propositions is true: (1) that opposition to abortion can reasonably be presumed to reflect sex-based intent, or (2) that intent is irrelevant.... Neither proposition is supportable.
 
 
 88
 As to the first: Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominately by a particular class of people, an intent to disfavor that class can readily be presumed. A tax on wearing yarmulkes is a tax on Jews. But opposition to voluntary abortion cannot possibly be considered such an irrational surrogate for opposition to (or paternalism towards) women. Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of or condescension toward (or indeed any view at all concerning) women as a class.
 
 
 89
 Bray, --- U.S. at ---- - ----, 113 S.Ct. at 759-60.
 
 
 90
 We do not mean to place Crist and STA on par with the anti-abortion protestors discussed in Bray. In the present case an element missing in Bray is present--the use of racial slurs, which are certainly evidence of the prohibited intent. We cite Bray only to make the point that the district judge too easily, and wrongly, in our view, dismissed STA's proffered motivation, saving fish, as a pretext for discrimination.
 
 
 91
 Opposition to spearing is not irrational. By necessity, the objects of that opposition will be Indians. That STA and its members have chosen to inject racism into the protest would allow a trier of fact to find that they are motivated by racism. However, the denial of that motivation by Crist and the other members of STA is not entirely unbelievable. The unfortunate frequency of racial slurs in our society, coupled with the plausibility of STA's proffered motivations, leaves motivation in dispute. The sincerity of the motivation proffered by Crist and his fellow STA members must be determined by a fact-finder at trial, not by the judge on summary judgment. Covalt, 950 F.2d at 485.
 
 
 92
 It is regrettable that Crist, STA and their supporters may view our decision today as a victory. We wish to dispel any such notion. As the record stands, the stench of racism is unmistakable. We refuse to fall victim to the maxim that "hard facts make bad law," however, and believe well-established principles governing the disposition of motions for summary judgment require that STA and Crist be allowed a trial to demonstrate the sincerity of their assertions of an absence of racial motivation.
 
 E. Attorneys' Fees
 
 93
 On July 17, 1992 the district court entered judgment awarding the LDF $182,745.92 for costs and fees pursuant to 42 U.S.C. § 1988, resulting in appeal No. 92-2672 which was consolidated with the prior appeal on the merits by order of this court dated November 4, 1992. Because we are reversing the judgment on the merits, we also vacate the judgment for fees and costs. Pardo v. Hosier, 946 F.2d 1278, 1285 (7th Cir.1991).
 
 
 94
 For the foregoing reasons, we affirm the district court's decisions to deny STA's request for a jury trial, motions for disqualification and to amend its answer, and to grant the LDF's motion to strike STA's supplemental brief. We reverse the district court's order granting summary judgment and dismissing the LDF's remaining causes of action. We vacate both final judgments, reinstate the preliminary injunction and remand for further proceedings consistent with this opinion. Circuit Rule 36 shall not apply on remand.
 
 
 95
 AFFIRMED IN PART; REVERSED IN PART; VACATED AND REMANDED.
 
 
 96
 MANION, Circuit Judge, concurring.
 
 
 97
 I join the court in its discussion and holding in parts I, II, and III.A, B, C and E. However, I concur in the reversal of the district court's summary judgment under part III.D. I write separately to express a somewhat different view of the evidence of racism in this case.
 
 
 98
 By their treaty with the United States (Treaty of September 30, 1854) the Chippewa Indians retained rights outside the boundaries of the reservation, including the (unrestricted) right to fish certain waters in Wisconsin. See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341 (7th Cir.1983). The defendants consider the Chippewas' methods of spearfishing an abuse of the terms under the treaty. Because only Indians can use spotlights to spear spawning game fish (methods otherwise prohibited by Wisconsin law), race inevitably pervades the conflict between the Indians who want their fishing rights and the Wisconsin residents who want those rights restricted.
 
 
 99
 Section 1982, enacted as part of the Civil Rights Act of 1871, guarantees to all citizens the same property rights as enjoyed by white citizens. The obvious assumption of section 1982 is that white citizens have certain property rights, and that those same rights might be denied to others on account of race. The irony in this case, however, is that the Indians have the exclusive fishing rights and non-Indian citizens wish to protest, making racial overtones inevitable. These facts distinguish this case from the employment or housing discrimination suits that we commonly encounter, where property rights may be obtained regardless of race.
 
 
 100
 On the surface, at least, this is a protest case. Because only Indians have the right to spear fish, it is not likely that the defendants could protest without dealing with the issue of race in some manner. Race obviously played a major part in the original treaty preserving Indian fishing rights. Necessarily it would play some part when members of the public demonstrate to take those rights away.
 
 
 101
 I am not comfortable with the court's discussion separating evidence of racist activity from racist motivation. While some may argue that "[w]e live in a society in which racism is pervasive and racial slurs are common," [supra p. 1262] it is just as likely that some of the protesters were as offended by the racial slurs as they were by the Indians' fishing methods. The actions taken by some probably expose their motivation. A district court cannot read a person's mind, so in order to determine motive, the court must consider the person's actions. Slurs may result in the heat of an encounter that was motivated by a sincere objection to spearing fish. In that case the racial motive may be insignificant. On the other hand, if a person is drawn to the protest in order to use the opportunity to vent racial animus against Indians, he violates section 1982, regardless of his objections to the fishing methods.
 
 
 102
 I concur in the result because the defendants' affidavits are sufficient to place in dispute the issue of whether race played a motivating part in their actions. This "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights v. Metropolitan Housing Dev'l Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). At trial, the district court will need to determine whether the defendants meant to protest fishing rights, malign Indians, or both.
 
 
 
 [1]
 After preliminary review of the briefs in Case No. 92-2672, the court notified the parties that it would be decided by the same panel that had heard oral argument in Case No. 92-1315, and that the court had tentatively concluded that oral argument in No. 92-2672 would not be helpful. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Circuit Rule 34(f). No such statement having been filed, the appeal has been submitted and decided on the briefs and record
 
 
 [2]
 The Honorable James T. Moody, United States District Court Judge for the Northern District of Indiana, sitting by designation
 
 
 [3]
 For convenience, the remainder of this discussion will use "LDF" as a reference to the Band collectively with all plaintiffs-appellees, and, where the context connotes, as a reference to members of the Band who spear. "STA" will be used to refer to both defendants-appellants, except in cases where defendant-appellant Crist is mentioned separately
 
 
 [4]
 This apparently is an important office in STA's corporate hierarchy. Crist was the individual who answered all discovery requests directed to the corporation. In addition to Crist, the other corporate officers of STA were named as defendants. All but one settled; only Crist and STA continue to litigate
 
 
 [5]
 Portions of the record, mainly answers to interrogatories directed to STA and the transcript of Crist's deposition, reveal that association with STA is a slippery concept. STA considers anyone who makes a "donation" to be a "member." It does not appear that any rights, privileges or responsibilities attach upon becoming a member. No membership roll is kept, making it impossible to identify all of the members, or to dispute a claim of membership. As a result, every protestor may have been a member
 
 
 [6]
 The preliminary injunction was entered against other "private" defendants in addition to appellants. With the exception of one party who has not participated in this appeal, those other defendants were all dismissed after settling with plaintiffs
 The preliminary injunction was denied as to several law officers named as defendants, who were later dismissed from the action.
 
 
 [7]
 STA cites only Fed.R.Civ.P. 39. Subsection (c) of Rule 39 allows the court discretion to conduct a jury trial of actions where there is no right to a jury trial only "with the consent of both parties." The LDF not having consented in this case, STA has provided no applicable authority
 
 
 [8]
 That October 1, 1992 deadline was subsequently extended to October 15, 1992. This brief extension does not alter our analysis
 
 
 [9]
 For the same reason, it is not necessary to address STA's argument that the terms of the injunction violate Wisconsin state laws governing the use of navigable waters
 
 
 [10]
 This oversimplifies to avoid unnecessary discussion. Race is relevant to another aspect of STA's philosophy: by upholding treaties, the United States unfairly grants Indians "rights" not granted to other groups. While this tenet of STA's ideology reveals confusion over the difference between honoring contracts and creating rights, it also indicates a misguided notion of equality rather than racism against Indians
 
 
 [11]
 STA devotes much of its argument that its motivation was in dispute to attempts to show that various examples of racially-derogatory conduct were not what they seem. For example, it is undisputed that Al Soik, a director of STA, chanted "Tom, Tom, the white man's son" at protests. STA argues that this chant does not demonstrate racism because Soik, by affidavit, stated he believed it "not racist because not directed at Indians in general, only a specific individual." On summary judgment, Soik's affidavit must be believed: he did not think the chant was racist. But Soik's subjective belief does not answer the question
 Racism has both a subjective and objective measure. For example, an employer who discriminates against a non-Asian job applicant in favor of an Asian due to a belief that "Asians are better at math," commits a racist act no matter how strongly the employer subjectively believes Asians have superior math skills. Thus, we agree with the district court's findings of undisputed evidence of racism.
 The issue, however, is not whether Crist and STA are racist. It is whether that racism was a motivating factor in the decision to harass LDF spearers. If the spearers were white, would STA and Crist have protested anyway, but seized upon some other attribute, such as hair length, to insult?
 
 
 [12]
 On the other hand, if STA had offered evidence that it also never protested against other activities allowed exclusively in Wisconsin to Native Americans, such as on-reservation gambling, could an inference be drawn contrary to the district judge's inference of bias against Indians? While both inferences may be permissible, neither is required. On summary judgment, STA is entitled to the inference that LDF spearing was the first event perceived so harmful as to galvanize protest