Michael BACHMAN and Barbara Bachman, Plaintiffs–Appellants,

v.

ST. MONICA'S CONGREGATION, John T. Donovan, Philip Damiano, and William F. Judge, Defendants–Appellees.

No. 89–2807.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1990.

Decided May 23, 1990.

Rehearing Denied June 20, 1990.

Lawrence M. Shindell, Douglass H. Bartley, Shindell & Bartley, Milwaukee, Wis., for plaintiffs-appellants.

Eric J. VanVugt, Michael Collard, Minahan & Peterson, Milwaukee, Wis., for defendants-appellees.

Before POSNER and EASTERBROOK, Circuit Judges, and MOODY, District Judge.[*]

POSNER, Circuit Judge.

A Jewish couple, whose suit charges discrimination in housing in violation of 42 U.S.C. §§ 1981 and 1982 (Reconstruction-era statutes forbidding racial discrimination) and 3604 (the Fair Housing Act), appeals from a judgment for the defendants—a Catholic parish, its priest, and

others—entered upon a jury verdict. The parish owned a house that it decided to sell, and the Bachmans put in an offer. The parish then briefly withdrew the house from the market to see whether any of the parishioners wanted to buy it. None did. The house went back on the market but was sold to a Catholic couple who were not members of the parish. The price this couple paid was higher than the price the Bachmans had offered; but there is disagreement over whether, when contingent provisions relating to financing and the sale of a previous home are factored in, it was a worse deal for the parish.

When the Bachmans had first expressed interest in the house, the real estate agent handling the matter for the parish had asked them whether they were parish members and had expressed the belief that the parish would prefer to sell the house to a member. The Bachmans said no, they were not members of the parish—they were Jews. The real estate agent testified that he did not mention this to the priest, and the priest testified that he did not know the Bachmans were Jewish or even guess they were, since the only "Bachman" he had known previously was a Catholic. The priest denied wanting to sell the house to a member of the parish or to a Catholic; his explanation for the parish's action was the higher price offered by the Catholic couple.

The Bachmans do not argue that the jury's verdict is unreasonable, but only that the instructions were in error. They particularly object to the following instruction: "Giving some preference in the sale of the house to members of St. Monica's Congregation or members of the Roman Catholic faith does not alone constitute ancestral discrimination." Some background is necessary to make sense of the instruction and of the argument against it. The awkward phrase, which appears in no statute, "ancestral discrimination" is an effort to convey in an inoffensive manner the dual character of anti-Semitism. There is religious anti-Semitism, typified by the attitude of the medieval Roman Catholic Church, and

---

[*] Hon. James T. Moody, of the Northern District of Indiana, sitting by designation.

racial anti-Semitism, typified by Hitler. The one objects to Jews because of their religion, the other objects to Jews because they are descended from Jews, even if they are converts to other faiths. Nowadays the use of the term "race" is pretty much limited to the three major racial divisions— Caucasoid, Negroid, and Mongoloid—but historically the term was used much more broadly, to denote groups having common ancestry or even a common culture (or, as often, both). And in this sense Jews are members of a distinct race. The civil rights statutes enacted in the period of Reconstruction, in guaranteeing all persons the rights of white citizens, have been held to protect all groups that are "races" in the traditional loose sense, such as Jews and Arabs. *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987); *St. Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1308 (7th Cir.1989). It is this rather complex concept and tradition that the instruction in question sought to convey by the term "ancestral discrimination," and while the term may be awkward there is no suggestion that it misled the jury. In making clear that the protection of the statute is not limited to *observant* Jews, the term actually helped the Bachmans by eliminating any need for them to prove that they are observant.

Also in the background of the instruction is a provision in the Fair Housing Act that allows a religious organization both to "limit … the sale … of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion," and to "giv[e] preference to such persons." 42 U.S.C. § 3607. The defendants had sought summary judgment on the basis of this provision, but when the judge denied their motion (on grounds that are not clear) they decided not to rely on the provision at trial. They may have feared that while exonerating them from the charge of violating the Fair Housing Act, it would inculpate them of violating sections 1981 and 1982, which contain no similar defense, at least explicitly. There was also the possibility that the parish might be found to have owned the house for "a commercial purpose"—a term in section 3607 that has never been construed. At all events, the priest testified that he gave no preference to members of the parish or to other Catholics beyond what was implicit in taking the house off the market just long enough to give the parishioners a chance to bid on the house. This was a preference, but it had no causal relation to the Bachmans' loss of the deal, since no parishioner stepped forward.

 The Bachmans object to the giving of this instruction that, they say, allowed the defendants to defend their conduct on the basis of a policy that the defendants denied following. The objection misconceives the instruction's purpose. It is true that the defendants denied giving a preference to Catholics. By thus forswearing any reliance on section 3607 they opened the way for the Bachmans to argue—as they did—that the denial was false, that the defendants did prefer Catholics, and that this preference violated the statutes that the defendants were accused of violating. They were arguing in effect that to discriminate in favor of Catholics is to discriminate against Jews. This may be a good argument under the Fair Housing Act once the defense in section 3607 is stripped away, because section 3604 expressly forbids discrimination on the basis of religion, and to give a preference to Catholics is to discriminate against non-Catholics, to discriminate in other words on religious grounds; if this were not so, there would be no need for section 3607. But, we hold in this case of first impression, it is not a good argument under sections 1981 and 1982. Those statutes forbid unequal treatment based on *race*, and while for this purpose Jews constitute a race, it is not the case that every preference based on religion is a discrimination against a race. Suppose a Bahai organization refused to sell property to persons not of the Bahai faith. It would be extremely odd to describe such a policy as anti-Semitic. The policy would cut across racial grounds, however broadly or narrowly the term "race" was construed. Cf. *Tagatz v.*

*Marquette University,* 861 F.2d 1040, 1046 (7th Cir.1988); *Pime v. Loyola University,* 803 F.2d 351, 357 (7th Cir.1986) (concurring opinion).

■ The defendants were entitled to an instruction that even if, as they denied but the plaintiffs asserted (and the jury might believe the plaintiffs), they had given a preference to Catholics, or to the particular Catholics belonging to St. Monica's Congregation, this did not alone constitute discrimination against the Jewish race ("ancestral discrimination"—not religious discrimination). It might be evidence of discrimination against Jews but it would not be, in itself, discrimination against Jews. It would not be like reverse racial discrimination or affirmative action—a preference, say, for blacks, which necessarily hurts whites, another racial group. A preference for Bahais hurts all non-Bahais, a preference for Catholics all non-Catholics; it is not a harm to a particular group of non-Bahais, or of non-Catholics, such as Jews. This case is therefore much like *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), where a statute that discriminated in favor of veterans was held not to be a form of sex discrimination, even though few veterans are women, just as few Catholics are of Jewish ancestry.

■ The plaintiffs' next objection is entangled with a procedural bobble in the district court. At the instructions conference, held shortly before the trial ended, the parties noted which instructions they agreed on and which were objected to and the judge said he would prepare a final draft of the instructions. Unfortunately he did not give counsel copies of that draft until a few minutes before he began reading it to the jury. Counsel read along but the plaintiffs' counsel did not notice until after the jury had returned its verdict that the judge had omitted a portion of the instruction on circumstantial evidence that the parties had agreed on. The defendants argue that the objection comes too late. Ordinarily of course they would be right. Fed.R.Civ.P. 51. But when the judge ad libs instructions—that is, departs from the

instructions as set at the instructions conference—he must give the parties a reasonable opportunity to object. *Joseph v. Brierton,* 739 F.2d 1244, 1249 (7th Cir.1984); see also Fed.R.Civ.P. 46. Because Judge Curran did not tell the parties that he was departing from the instructions that had been agreed upon, the plaintiffs' counsel was not alerted to the importance of reading the instructions with special care and comparing them with the instructions that had been agreed upon.

But this is of no moment, because the judge committed no error in truncating the instruction. The portion he dropped merely repeated, albeit with emphasis, the truism stated elsewhere in the instructions that a racist intent can be inferred from circumstances. Likewise there was no error in the district judge's refusal to instruct the jury that it could reject a witness's testimony if it disbelieved the witness. This is a tautology, obvious to the juror of the meanest intelligence: the jury is not required to credit testimony that it disbelieves! Elsewhere in the instructions the judge told the jury that they, the jurors, were the judges of the credibility of the witnesses. That covered the point adequately. There is no duty to numb a jury with repetition of the obvious.

■ The plaintiffs' last objection is to the judge's refusal to instruct the jury that "it is of no legal significance if ancestry is the sole reason [for refusing to sell] or if it is simply a partial reason ...; if, in the midst of good reasons, ancestry is but one factor, a denial of housing would be unlawful." What is true is that if the defendants would not have sold the house to the Bachmans because they were Jewish, the fact that the defendants also had noninvidious reasons for refusing to sell to them would not be, in and of itself, a defense to liability under the statute. But what is equally true is that if the defendants would have refused to sell the house to the Bachmans even if the Bachmans had not been Jewish, the fact that the defendants would in any event have refused to sell to them because they were Jewish *would* let the defendants off the hook. To be actionable, racial prej-

udice must be a but-for cause, or in other words a necessary condition, of the refusal to transact. *Price Waterhouse v. Hopkins,* — U.S. —, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268 (1989); *Washington v. Electrical Joint Apprenticeship & Training Comm.,* 845 F.2d 710, 712 (7th Cir. 1988). Otherwise there is no harm from the prejudice—the harm would have occurred anyway—and without harm there is no tort, constitutional, statutory, or common law. *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.,* 896 F.2d 1035, 1041 (7th Cir.1990). The instruction offered by the plaintiffs did not place the causal issue clearly before the jury, and so it was properly rejected.

As a matter of fact, causation was not even an issue in this case. This was not a mixed-motives case such as *Price Waterhouse,* in which it is necessary to decide whether, but for the bad motive, the transaction sought by the plaintiff would have gone through. (If it would have gone through but for the bad motive, then the bad motive had causal force and the defendant is liable.) If the jury believed the plaintiffs, the only cause for the parish's refusing to sell them the house was their race, while if the jury believed the defendants the plaintiffs' Jewishness had nothing to do with the refusal. It was a binary choice, leaving no room for causally inefficacious discrimination, and the jury must have believed the defendants because otherwise it would have brought in a verdict for the plaintiffs. Causation was not an issue, and there is no reason to instruct a jury on a nonissue.

AFFIRMED.