LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, Michael Allen, Wa–Swa–Gon Treaty Association, Thomas Maulson, Robert Martin, Nick Hockings, and Gilbert Chapman, Plaintiffs,

v.

STOP TREATY ABUSE–WISCONSIN, INC., and Dean Crist, Defendants.

No. 91–C–117–C.

United States District Court, W.D. Wisconsin.

Feb. 7, 1994.

Brian L. Pierson, Irvin B. Charne, Hall, First & Patterson, S.C., Milwaukee, WI, for Lac du Flambeau Band, Michael Allen, Wa–Swa–Gon Treaty Ass'n, Thomas Maulson, Robert Martin, Nick Hockings, Gilbert Chapman.

Richard E. Sommer, Sommer, Olk & Schroder, Rhinelander, WI, for Stop Treaty Abuse–Wisconsin, Inc., Dean Crist.

Al Soik, pro se.

Elaine Soik, pro se.

Frederick E. Hatch, Sayner, WI, for Wayne Pieper, Glen Handrick, Howard Caputo, Jack Lanta, Rose Lanta, Lois Pavlovich, Patrick Long, David Worthen and Mike Ahlborn.

Tommy Handrick, pro se.

Charles Ahlborn, pro se.

Steven Garbowicz, Drager, O'Brien, Anderson, Burgy & Garbowicz, Eagle River, WI, for Charles Gilman.

Brian Crist, pro se.

Charles H. Bohl, Milwaukee, WI, for James Williquette, David Endblom and Wayne Wirsing.

## OPINION and ORDER

CRABB, Chief Judge.

In this civil action, plaintiffs are seeking a permanent injunction restraining defendants from interfering with plaintiffs' exercise of their treaty-preserved rights to hunt, fish and gather in the area of northern Wisconsin ceded to the United States by the Lake Superior Chippewa Indians in 1837 and 1842. Plaintiffs allege violations of these rights under 42 U.S.C. §§ 1982, 1985(3) and 1986 and under state law. In an opinion entered on January 6, 1992, I granted plaintiffs' motion for permanent injunctive relief after finding that defendants had interfered with § 1982's guarantee that all citizens are to enjoy the same rights enjoyed by white citizens to "inherit, purchase, lease, sell, hold and convey real and personal property" when they interfered with plaintiffs' exercise of their right to spear fish by such acts as battering and assaulting the Indian spearers, causing wakes on the water that endangered the spearers, blocking the spearers' access to the waterfront, preventing the spearers from launching their spearing boats, impeding the movement of spearing boats and shining lights into the eyes of the spearers. From the record, which was replete with examples of racial epithets and stereotyped characterizations of Indians, I was satisfied that plaintiffs had shown that defendants' acts were motivated by racial bias toward Indians and that their protestations to the contrary were insufficient as a matter of law to overcome the showing of racial bias. Accordingly, I granted plaintiffs' motion for summary judgment and entered a permanent injunction against defendants' interference with plaintiffs' exercise of their right to spear fish. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisconsin, Inc,* 781 F.Supp. 1385 (W.D.Wis. 1992). A separate judgment for fees and costs was entered on July 17, 1992 in favor of the Lac du Flambeau band as a prevailing party pursuant to 42 U.S.C. § 1988. On

appeal, the Court of Appeals for the Seventh Circuit reversed the grant of summary judgment, vacated the judgment for fees and costs, and remanded the case for trial, holding that the motivation for the interference with plaintiffs' spearfishing was a disputed issue of material fact that could not be resolved on summary judgment. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisconsin, Inc.,* 991 F.2d 1249 (7th Cir.1993).

From the evidence adduced at the bench trial held in conformance with the court of appeals' directive, I find that defendants' interference with plaintiffs' spearfishing was racially motivated, that is, it would not have occurred but for the racial animus of defendants and their followers.

From the undisputed facts of record and from the evidence adduced at trial, I find the following facts.

### FACTS

*The Parties*

Plaintiff Lac du Flambeau band is a band of the Lake Superior Chippewa, a federally-recognized tribe. In 1837 and 1842 the tribe entered into treaties with the United States ceding huge tracts of land in northern Wisconsin, Michigan and Minnesota to the government while reserving the right to hunt, fish and gather throughout the ceded territory. Plaintiff Michael Allen is president of the Lac du Flambeau band. Plaintiff Wa–Swa–Gon Treaty Association is an unincorporated association consisting of members of the Lac du Flambeau band and others. It supports the tribe's exercise of off-reservation treaty fishing rights. Plaintiffs Tom Maulson, Nick Hockings, Robert Martin and Gilbert Chapman are members of the band who reside on the Lac du Flambeau reservation and wish to engage in off-reservation treaty-protected fishing in the ceded territory without unlawful interference.

Defendant Stop Treaty Abuse–Wisconsin, Inc. is a for-profit corporation organized under the laws of the state of Wisconsin, with its principal place of business in Woodruff, Wisconsin. Its avowed purpose is to stop tribal members from exercising their off-reservation treaty rights including their rights to spear and net fish. Defendant Dean Crist is a member and co-founder of STA and its chief spokesperson.

Defendant Crist, a resident of Minocqua, Wisconsin, works as a consultant for Alexander's Pizza, Inc., a restaurant he founded. He was born in Blue Island, Illinois in 1948. He attended racially integrated schools when he was growing up and worked as a camp counselor in multi-racial summer camps for children during the 1960's. He has enjoyed sport fishing since he was a young child. In college, he took courses in fisheries management and intended to go to graduate school to continue those studies but was unable to obtain financial assistance. He moved to Minocqua in 1972 and opened Alexander's Pizza, Inc. He has hired Indians as employees in his restaurant.

Defendant Crist moved to northern Wisconsin in large part because of the fishing opportunities there. In his opinion, spearing and netting have had a detrimental effect on the inland lakes' populations of game fish although he admits that it may be "a buried detriment because nobody knows all of the effects of the spearing as it is currently practiced." He has seen the bag limits for walleye and muskie for sports fishermen decrease since 1983 and believes that the economic health of the community is correlated directly to the quality of sport fishing in the region.

*Spearing*

Under the applicable treaties, the Lake Superior Chippewa have the right to catch fish by spearing and netting. State law prohibits all other persons from engaging in such activity on any inland lakes, except that non-Chippewas may net buffalo fish and carp on a few very large inland lakes and may engage in winter ice spearing of sturgeon on Lake Winnebago. Chippewa spearing and netting are carefully regulated and monitored by wardens from both the Wisconsin Department of Natural Resources and the Great Lakes Indian Fish and Wildlife Commission, an inter-tribal, interstate organization. For example, spearers are required to obtain a permit for spearing, which is good

for only one night and can be obtained only on the day the spearing is to take place.

The majority of Chippewa spearing occurs in the early spring. It begins as soon as the ice thaws from the lakes and lasts as long as spawning is taking place: usually between one to two weeks on any particular lake for walleye and an additional one to two weeks thereafter for muskellunge. To spear the fish, tribal spearers stand in small boats or canoes and use a long metal five-tine spear. Because spearing begins at twilight and continues on into the night, the spearer usually wears a large miner's type hat with a light attached to illuminate the shallow water below him. A spearer standing in a small boat in the dark in the early spring is vulnerable to falling into the icy water if the lake becomes rough or the boat is subjected to high wakes created by motorboats passing near the boat.

The spearers launch their boats from the boat landings at the lakes where they intend to spear. Boat landings are state or county-owned areas set aside for public boat launching. Some landings include vehicle parking areas, but many landings are too small for parking and consist of little more than a small open space among the trees.

Before spearing, it is common for the Chippewa to hold a traditional ceremony involving prayers and the placing of a tobacco or "asema" offering into the water.

*Defendant Crist's and STA's Operation*

STA was formed at the end of the spring spearing season in 1988. During the following winter, articles of incorporation were drawn up and board meetings were held. The first general meetings took place in the spring of 1989. At that time, a "couple hundred" persons had joined, each paying a ten dollar membership fee. At first the board intended to use the money to intervene in the ongoing litigation between the state of Wisconsin and the Chippewa. When that proved impossible, the board decided to organize protests at the landings. It was important to STA and to Crist to get as many people as possible to the landings. Defendant Crist believes that STA was responsible for bringing large crowds of protesters to the landings.

Persons who wanted to know where STA would be protesting on a given night could call defendant Crist's restaurant to be directed to a particular boat landing. Generally, defendant Crist would organize protests at the landings where he believed members of the plaintiff band planned to spear. His goal was to reduce the walleye harvest of the tribal members; to that end, he urged persons to come to the landings, to crowd the landing area and to protest the spearing. Also, he organized on-water flotillas of motorboats to crowd the launch area, making it difficult for spearers to launch their boats, and to create wakes near the spearing boats, interfering with the spearing and endangering the spearers while they were spearing. On some landings in 1989 and 1990, defendants Crist and STA attracted as many as 1,000 to 3,000 protesters. Many of the protesters, including Howie Caputo, a leader of STA, wore blaze orange hunting attire. From the 1990 season on, many also sported shirts, hats and buttons with STA insignia on them. Several of the protests became violent, particularly in 1989, when drinking was still permitted on the landings. The incidence of violence decreased in 1990 after alcoholic beverages were no longer permitted at the landings.

STA advised members who were going to be making wakes on the lakes to make sure they had lawful illumination and personal flotation devices. Defendant Crist warned STA members not to target a specific group but to emphasize the injury to the resources. In 1990, STA published and distributed a flyer entitled "Protesting Policy," in which it stated that it supported only peaceful protests and asked protesters not to carry signs containing racial slogans, not to shout racial or obscene remarks, not to throw rocks or other objects, not to engage in arguments with treaty supporters and not to engage in physical violence with treaty supporters.

STA sponsored a concrete walleye decoy contest, which was designed to encourage the planting of concrete walleye decoys in the spawning beds on which it was hoped that the spearers would break their spears. On many landings in 1990, protesters used whis-

tles to blow directly into the ears of spearing supporters. STA sold whistles at the landings in 1990 and included them in the STA protest kits they sold at their rallies. The packets were called "resource rape" kits in reference to Crist's and other STA members' references to spearing as a rape of the resources.

Immediately following the filing of this lawsuit, the STA board authorized the destruction of all STA membership lists. At this time, STA has no minutes, no records of contributors to the organization, no record of the lakes and landings where it organized protests, no lists of persons who participated in the STA lake watch system, no records of individuals on whose behalf STA has paid legal fees or costs, and no list of lakes and landings where STA has protested and the dates of the protests.

*Incidents at Landings and on Lakes*

On the lakes where plaintiffs and other tribal members speared in 1989, 1990 and 1991, protesters used high-powered motorboats to create wakes and rock the boats in which spearers were standing, threw stones at the spearers who were trying to launch their boats from the landings, crowded the landings to try to prevent spearers from getting their boats to the water, encircled the launch areas with their motor boats to interfere with the spearers' efforts to launch their boats and move them away from the landings, taunted and threatened spearers and their supporters, yelled racial and sexual insults, shined lights in the eyes of spearers as they were spearing, and mocked the religious and cultural significance of spearing. Often, protesters threw rocks that struck spearers and caused injury. At one lake, protesters used slingshots to hurl rocks at spearers. At another lake, a protester struck a spearer with a fishing lure he cast at the spearer. This interference and harassment took place despite the presence at the lakes of numerous law enforcement officers recruited from the entire state and mobilized into an emergency force for the spearing season and despite the establishment of fenced-off areas intended to separate protesters and supporters from the boat launching areas.

At landings where plaintiffs speared in 1989 and 1990, protesters yelled such comments as, "All you Indians that are on welfare" or "All you Indians that are filling up our jails" and asked Indian women at the landings, "What do you use that spawn for, to douche?" Indians with long hair were called "Tonto" or "redskin." Protesters asked spearers where they got their boats and trailers and made statements to the effect that taxpayers had paid for the boats. At Arbor Vitae Lake, protesters sang a variation of the song, "Tom Dooley," to plaintiff Tom Maulson as he tried to spear: "Hang down your head, Tom Maulson, hang down your head and die." At many landings, STA board member Al Soik and his wife Elaine Soik beat on drums to the chant of "Hey, how are ya? Hey, how are ya?" in mockery of an Indian chant. On several occasions, Elaine Soik wrapped a bandanna around her head, stuck a twig in her hair as a feather, and caricatured an Indian ceremonial dance. On Minocqua Lake, STA leader Jack Lanta stated, "Niggers are better than Indians." At Big Arbor Vita, Jack Lanta said, "Those Indians are all on welfare that are out there spearing." At one landing, protesters commented in reference to some young Indian men who had brought drums to the landing, "The hardest work they've ever done in their life is pounding on that drum."

On one occasion on Trout Lake, STA leader Howie Caputo yelled, "Go home, timber niggers" to plaintiff Maulson while circling Maulson's spearing boat in his own motorboat. Other STA members made comments to the effect that Indians couldn't find their food stamps because they kept them under their work boots. Members of STA, including board member Tommy Handrick, frequently called spearers "welfare warriors," "wagon burners" and "timber niggers." At Squirrel, Willow Springs and Namekagon lakes, protesters yelled, "Timber nigger" and "You're a defeated people; you are a conquered people." At Sand and Dam Lake, protesters chanted, "Spear an Indian, save a walleye. Drown 'em, drown 'em." Especially during the 1990 spearing season, it was customary to reserve the derogatory chants until after 10:30 p.m., by which time most of

the press and camera crews had left the landings.

Protesters yelled, "Dead Indian, dead Indian" and sang, "A half breed here; a half breed there," to the tune of "Old McDonald had a farm." At Eau Pleine Reservoir, they referred to Indian women as squaws and bitches and said, "The only good Indian is a dead Indian." In 1989, they said that "Custer had the right idea" and "Tom Maulson is nothing but a fucking Jew. We need another Hitler to take care of him."

At numerous landings, protesters came up to spearing supporter Anita Koser and talked about stabbing her in the back. Protesters made such statements as "Wait until the lights go out. Then we're going to have some fun"; "If those law enforcement officers weren't there, we'd really have some fun" and "You're not going to go home tonight except in a body bag." Protesters told plaintiff Hockings, "You're not going to get home tonight. You're not going to get off the boat landing. You're not going to get off the water. I'll shoot you in the back of the head."

Spearers were the subject of threats of death and violence to themselves and their families even when they were not at the landings or out on the water. They heard the threats on the street in town, in the media and on the road on the way to the landings. For example, protesters carried signs at the landings that read, "Spear an Indian, save a walleye" and "Spear a pregnant squaw, save two walleyes." Some wore hats or shirts that showed a frontal view of a gun barrel and said, "Spear this." At Eau Pleine Reservoir, a protester carried a mannequin's head made to mimic the head of an Indian mounted on a spear. STA board member Dave Worthen displayed a poster in his tavern that read, "Wanted: Small Indians for mudflaps. Must be flexible and willing to travel."

In 1991, protesters appeared at landings carrying the Plains Indian flag with a black circle and a slash painted across the face of the Indian. The Plains Indian flag is an American flag that has a picture of the face of a Plains Indian in place of the stars. The Indians view the stars of the American flag as celebrating places in which Indians died and find them offensive for that reason; the Plains Indian flag signifies to them their pride in being both American and Indian. At Sand and Dam Lake in 1991, STA members lighted a Plains Indian flag and burned it.

At Star Lake, one protester suggested opening the car doors and letting the dogs out to attack spearers and their supporters. Another responded, "No. Remember they are just Injuns. They eat dogs," and the first protester laughed.

At many lakes, protesters threw stones at spearers who were in the water. At some lakes, protesters threw stones at the families and supporters of spearers who were on the landings. At Trout Lake, a small group of spearers trying to launch boats was rushed at by protesters. When the police subdued the surging protesters, other protesters threw rocks at the spearers. At North Twin Lake, protesters followed the spearers into the water, throwing rocks at them as they launched their boats. When the spearers returned from fishing at the end of the night, they were greeted with more rocks. Plaintiff Nick Hockings was hit in the back with a rock; another spearer was hit in the knee. Other protesters waded into the water, telling those "fucking" Indians to go home or they wouldn't get home. On Big Arbor Vitae Lake, plaintiff Maulson's son was hit in the back by a stone thrown from the landing. At Butternut Lake, tribal spearer Robert Chapman was hit by a shot from a pellet gun.

*Incidents Involving Defendant Crist*

At Big Arbor Vitae Lake, defendant Crist and other boaters, whom he called the "STA navy," tried to create wakes on the lake to keep the spearers from spearing. Another time at Big Arbor Vitae Lake, he and the others surrounded another spearer, Scott Smith, and told him he wasn't going to leave the lake that night. On one occasion at Plum Lake, defendant Crist used his bullhorn to lead the crowd in various chants and to ridicule plaintiff Hockings with insults about his being "a traditional Indian in a traditional aluminum boat made from a traditional aluminum tree." Later that evening, defendant Crist and other protesters brought their

boats within about twenty feet of a spearing boat and mocked the traditional tobacco ceremony in which plaintiff Hockings and his wife were engaging at the time. As Hockings's boat moved away from the landing vicinity, approximately fourteen motor boats began creating high wakes that caused the spearing boat to rock, throwing plaintiff Hockings's wife out of her seat and injuring her back. To evade the motor boats, the spearers tried to go in closer to shore, but were met there by a group throwing stones.

On Star Lake, defendant Crist created wakes that caused spearer Brooks St. John to fall down in his boat and injure his back. On Squirrel Lake, Crist and others made wakes in an effort to stop spearer Scott Smith from spearing. At one time during the evening, they came within about twenty feet of Smith's boat, traveling at full speed.

On numerous landings during the spearing season in 1989 and 1990, defendant Crist told the crowds of protesters, "You're doing a good job. Keep up the good work. Don't quit; we're winning." He often used the term "squaws" in a derogatory reference to Indian women and made comments about fat, ugly, lazy Indians, Indians on welfare and Indians being unable to hold down jobs. In 1990 at Big Arbor Vitae Lake, Crist pointed to two Indian girls nearby and said, "Look at those fat Indians. Eating all the commodities up at Flambeau there." On another occasion at Arbor Vitae Lake, defendant Crist said of plaintiff Maulson and other spearers, "Here come the welfare warriors; here come the walleye wimps."

At Lake Nakomis in 1990, defendant Crist came up behind Anita Koser and said to his companion, "Don't start that ceremonial sweat hog's ceremonial jacket on fire or we'll have a ceremonial scrap heap burning." Koser understood this to be a threat of physical harm. On another occasion, Crist told Koser that "You didn't get fat from eating walleye. You got fat from spending your welfare check at the bar."

Protesters saw defendant Crist as their leader. They sang a song to the effect that they would follow defendant Crist wherever he went. It was common for defendant Crist to pull up near a landing in his boat and address the crowd, using his megaphone, with comments such as "Are we having fun yet?" to which the crowd would respond with cheers. Defendant Crist would use his megaphone and yell, "STA" and the crowd would yell back, "STA." Another cheer he used was "What do you get for raping the resource? Indian AIDS."

At Sand and Dam Lake in 1991, while defendant Crist was speaking on his bullhorn, protesters surrounded one of the spearing supporters and her young children. When an African–American man tried to help her out, the crowd called him "nigger," "fried chicken," "watermelon seed-sticky nigger," and "Aunt Jemima" and suggested he go back to Africa. Others in the crowd yelled that "the timber niggers were getting a real nigger." Meanwhile, defendant Crist continued to encourage the crowd, using his bullhorn. Near the end of the same evening, Crist told the crowd, "It was a good evening; go home and rest up; we'll do this again."

Defendant Crist never used racial epithets in the presence of reporters. On two occasions, he quieted down a crowd of protesters at the request of law enforcement officers. One was at North Twin Lake in 1989, when an officer asked Crist to ask the crowd to settle down and let the spearers off the water. The second was an incident at Star Lake involving a group of people who had climbed onto the roof of a large public restroom and had begun fighting. At the request of the local sheriff, defendant Crist talked the group into getting off the roof. On another occasion he asked the protester bearing the spear embellished with a mock head of an Indian to leave the area.

At an STA meeting at the Arbor Vitae town hall in 1989, defendant Crist described STA's goal as stopping spearing and the exercise of other off-reservation treaty rights. His plan was to stop all spearing in one county each weekend. Initially, the focus was to be on Vilas County and the idea was to engage in peaceful sit-ins, with STA paying any fines incurred by STA members who were arrested. Crist told the audience to treat the police nicely and asked that they not throw rocks from slingshots at officers

and wardens. Someone in the audience asked "What about spearers?" There was a pause and then Crist and the audience laughed. Later, Crist said, "I don't mean to throw bottle rockets and stones at spearers, but it's okay to feel animosity toward them." He added that spearers "are blackmailing you and I."

At an STA meeting at the Sugar Camp town hall in 1989, a member of the audience told Crist that wrist rockets were unavailable; they'd been sold out everywhere. Crist chuckled and said, "If you're going to use one, make sure you get an Indian." Later, he said that STA did not advocate violence and that if people used wrist rockets they might be arrested. At the same meeting, he suggested that protesters come down to the landings with their boats and vehicles to clog the landings and keep the spearers from getting out in their boats and he promoted the making of wakes to interfere with spearing.

Defendant Crist helped write and distribute a STA–sponsored pamphlet to STA members and the public that contained the following statements:

a. Chippewa spearers use spears "mass produced in China and Korea," and outboard motors "manufactured in Japan";

b. Many speared fish are sold;

c. "Thousands of fish spoil because of warm weather and the lack of ambition to clean them. Each year thousands of spoiled game fish are dumped in dumps and along road sides because tribal member [sic] didn't want to clean them";

d. Tribal members receive "huge amounts of free government surplus food including cheese, butter, milk and other vast amounts of 'commodity' foods. Along with these free foods they receive free food stamps and a cost of living allowance of over $20,000/household/year. They are also eligible for free government housing, subsidized heat and light, a whole list of government entitlements and subsidies, and a host of other government benefits. Tribal members receive 100% free medical and dental care, free pharmaceutical coverage, free day care and free and complete educational subsidies."

e. "Tribal members are allowed to shoot eagles. These eagles are shot solely for financial gain.... Whereas the U.S. Fish and Wildlife Service has spent millions to protect endangered species, any tribal member is above laws which are designed solely for the preservation of endangered species. In Florida, a tribal member intentionally shot an Everglades panther, the rarest large wild cat in North America. He was released and unpunished because he was a tribal member and not subject to Federal Game Conservation laws."

Defendant Crist appeared on a radio talk show in Milwaukee with plaintiffs Maulson and Hockings and Sarah Backus, a member of the Midwest Treaty Rights Network. During the show he repeated the kinds of statements contained in the STA-sponsored pamphlet, including those to the effect that all Indians are on welfare and that the Chippewa waste the fish they spear.

The statements in the pamphlet are inaccurate. Indians are not entitled to surplus food or to food stamps simply by virtue of being Indian. They receive surplus food or food stamps only if they qualify for them under the same program requirements that are imposed upon all applicants for state or federal benefits. Indians are eligible for subsidized housing on the same basis as any other citizen; they do not receive a cost of living allowance of over $20,000 a household; and they do not receive free and complete educational subsidies. Like all other citizens, Indians are eligible for educational grants if their income is below a certain level. Indians are not allowed to shoot eagles or other endangered species. Had defendant Crist wanted to check the accuracy of the statements in the STA-sponsored pamphlet, he could have done so by telephoning or visiting the tribal operations office or by talking to tribal chairmen.

## OPINION

All citizens of the United States are guaranteed "the same right ... as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property" under 42 U.S.C. § 1982. To prove

a violation of this statute, it is necessary to prove both that property rights were interfered with and that the interference was motivated by racial prejudice. *Lac du Flambeau Band,* 991 F.2d at 1257 (citing *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 616, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1987)). The court of appeals has upheld the findings in the January 6, 1992 order that the right of the plaintiff tribe to exercise its usufructuary rights in the ceded territory is a property right, *Lac du Flambeau,* 991 F.2d at 1258–59, and that defendants interfered with plaintiffs' property right when they and others acting in concert with them or at their direction created wakes on waterways to interfere with spearing, planted concrete decoys, shined lights in the eyes of spearers, impeded the progress of boats, blocked spearing boats from moving from the boat landings out to the spawning beds and assaulted and battered members of the plaintiff band, their families and supporters. The only questions remaining to be decided on remand are whether racial prejudice was a motivating factor in the interference and, if it was, whether the interference would not have occurred but for the prejudice. *Lac du Flambeau,* 991 F.2d at 1257 (citing *Bachman v. St. Monica's Congregation,* 902 F.2d 1259, 1262–63 (7th Cir.1990)).

■ Plaintiffs bear the burden of persuasion on the first question, showing that race was a motivating factor behind the spearfishing protests; if they succeed, defendants bear the burden of showing that the interference would have occurred in the absence of racial prejudice. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 242–46, 109 S.Ct. 1775, 1786–88, 104 L.Ed.2d 268 (1989) (plaintiff must persuade the factfinder that discrimination played a part in the adverse decision, and then, to prevail, defendant must persuade the factfinder that, even if defendant had not taken the impermissible factor into account, it would have come to the same decision); *see Bachman,* 902 F.2d at 1262–63 ("To be actionable [under § 1982], racial prejudice must be a but-for cause, or in other words, a necessary condition, of the refusal to transact.") (citing *Price Waterhouse,* 490 U.S. 228, 109 S.Ct. 1775).

This inquiry is complicated somewhat by the fact that only Indians can spear fish, so that as a consequence, any protest against spearfishing is also directed against Indians. As the court of appeals noted, the United States Supreme Court confronted an analogous circumstance involving abortion protests in *Bray v. Alexandria Women's Health Clinic,* — U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). The Supreme Court determined that abortion protests were not motivated by animus against women despite the fact that only women can have abortions. In remanding this case for trial, the court of appeals noted, "While not repudiating the logic in all circumstances that animus against a group can be presumed from protest directed at that group, the Supreme Court's recent decision in *Bray* ... requires us to examine the application to the present facts critically." *Lac du Flambeau,* 991 F.2d at 1263. The court also observed that in this case, "an element missing in *Bray* is present—the use of racial slurs, which are certainly evidence of the prohibited intent." *Id.*

Even when examined critically, the use of racial slurs in this case is so prevalent as to provide overwhelming evidence of "the prohibited intent." This is not a case in which plaintiffs grasp at a few stray statements made over a three or four year period in an attempt to suggest a biased state of mind on the part of the speakers. Plaintiffs have adduced evidence of countless episodes in which defendant Crist or persons acting at his direction or with his knowledge and approval hurled racial epithets at the individual plaintiffs, other tribal members, their families and supporters and taunted them with signs bearing racially offensive messages. Plaintiffs have established that defendant Crist produced and disseminated a brochure depicting the Chippewa as lazy and wasteful and the recipients of extravagant governmental benefits; that an STA board member displayed a sign in his tavern that read, "Help Wanted: Small Indians for use as mudflaps. Must be flexible and willing to travel"; and that STA members and others acting in concert with them ridiculed plaintiffs' religious and cultural customs and labeled the practices hypocritical. This is strong evidence of a racial bias on the part of

defendants that cannot be dismissed as a coincidence resulting from the fact that only Indians spear fish.

■ Defendants argue that the court of appeals indicated that statements made at the landings cannot be used to show that defendants' harassment of plaintiffs was racially motivated. It is true that the court of appeals said that "racist conduct accompanying a particular behavior does not necessarily mean that the behavior was racially motivated." *Lac du Flambeau,* 991 F.2d at 1262. The key word is "necessarily." The court noted the possibility that racially derogatory remarks may be a consequence and not the cause of a protest, but it did not hold that such remarks can never be evidence of racial motivation or that they may not be considered as evidence in this case. The court did not deny that the indications of racist motivation in this case were strong; to the contrary, it noted that "the use of racial slurs ... [is] certainly evidence of the prohibited intent," *id.* at 1263, and that "the stench of racism is unmistakable," *id.* at 1263–64. The court remanded the case for trial to determine whether defendants' "racist acts *conclusively* demonstrate racist motivation." *Id.* at 1260 (emphasis added).

■ Throughout the trial, defendants tried to show that plaintiffs and their witnesses were unable to identify specific STA members who made racial taunts. Plaintiffs did not need to identify all of the speakers. The statements of the protesters are attributable to defendants. Defendant Crist and the STA board members orchestrated the protests. They held organizational meetings, publicized the lakes that were likely to be speared, encouraged the protesters to go out to the landings, and when the crowds showed up, used spokesperson Crist to direct the protests. When he wanted the crowd to quiet down, Crist used his bullhorn to make it do so; when he wanted more "enthusiasm" or more intimidation, he achieved that as well. To say that the crowd's remarks are not attributable to defendant Crist defies common sense. For all intents and purposes they are his remarks.

Moreover, Crist's admission that the STA board ordered the destruction of the STA membership lists upon the filing of this lawsuit entitles the court to presume that the destroyed lists were unfavorable to defendants. *Brown & Williamson Tobacco Corp. v. Jacobson,* 827 F.2d 1119, 1134 (7th Cir. 1987), *cert. denied sub nom. CBS Inc. v. Brown & Williamson Tobacco Corp.,* 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988). In light of the document destruction, it is fair to presume that all of the persons who uttered racial slurs or engaged in violent acts were members of STA.

Although at trial defendant Crist attempted to distance himself from the acts and statements of persons on the landings, he did not succeed in doing so. The fact is that he was present on the landings or on the water when many of the racially-biased statements were made. Not only did he fail to take any effective action to stop the taunts, he repeatedly exhorted the crowds to "keep up the good work." It is true that on two occasions he quieted down potentially dangerous situations at the request of law enforcement officers and that on another occasion he asked a protester to leave. It is also true that in 1990 STA passed out flyers encouraging protesters not to carry signs containing racial slogans and not to shout racial or obscene remarks. However, these isolated actions are dwarfed by Crist's activities on the landings and on the water as well as by his tacit approval and active encouragement of the racial invectives that were voiced and the acts of intimidation that were committed in his presence. In the eyes of the protesters, law enforcement officers and spearers, defendant Crist was the leader of the protests. He was the one with the megaphone. He was the one who played peacekeeper while the TV cameras were present and reviled the Chippewa when the cameras were absent. When he told his supporters not to make racial remarks and not to throw stones at the Indians, they understood him to intend the advice only as a public relations ploy. They knew he was not criticizing them for their racist attitudes. This is why they laughed at the meeting in Arbor Vitae when he made a point of warning STA members not to use slingshots against law enforcement officers

but omitted any similar warning about not using the slingshots against Indians.

Defendant Crist's goal was to increase the number of people at the landings to intimidate and harass the spearers. A most effective way to get people out on the landings was to appeal to their prejudices. The racism displayed at the landings was no "undesired component of STA's protest activities, unrelated to the legitimate, non-discriminatory motives proffered by STA," *Lac du Flambeau*, 991 F.2d at 1261, but the expression of a deep vein of feeling that defendant Crist deliberately tapped into in concert with STA and exploited to bolster the protest activities.

In its opinion remanding this case, the court of appeals noted that there may be circumstances in which racist remarks are an unfortunate outgrowth of a protest rather than an indication of the purpose behind the protest. *Lac du Flambeau*, 991 F.2d at 1262. If, for example, a striking union member were to call the president of the company a racially offensive name in the heat of the strike, the name-calling would not necessarily mean that the strike was racially motivated. That is not the circumstance in this case. Defendant Crist employed racial stereotypes from the beginning, in an obvious attempt to exploit the deep-seated racism that existed in northern Wisconsin for his own purposes. *See Price Waterhouse*, 490 U.S. at 294, 109 S.Ct. at 1813 (noting that evidence of use of "stereotypes is, of course, quite relevant to the question of discriminatory intent"). By portraying the Indians as undeserving of the rights that they had preserved by treaty, he could justify the efforts to prevent tribal members from exercising those rights. Both in the STA brochure and in his radio appearance in Milwaukee, Crist emphasized the unworthiness of the Indians, perpetuating the idea that they were lazy and wasteful and lacking in respect for conserving nature. He had no compunction about ridiculing the cultural aspects of Indian spearing or the spearers' attempts to engage in religious ceremonies before spearing. "Perpetuating and encouraging stereotypes of persons as lazy or wasteful and ridiculing their religious and cultural practices are classic forms of racism that enable the perpetrators not only to rationalize the oppression of such people but to reinforce identification with the dominant group." *Lac du Flambeau Band*, 781 F.Supp. at 1394 (citing Kimberle Crenshaw, *Race, Reform, and Retrenchment: Transformation and Legitimation in Antidiscrimination Law*, 101 Harv.L.Rev. 1331 (1988)).

By giving the public reasons for believing that the Indians were "bad people" who were unworthy to exercise special fishing opportunities and by condoning the use of racial epithets, assaults and the ridicule of Indian culture and religion at the landings, defendant Crist made it clear that he and STA encouraged and supported such prejudice. In no way can it be said that the consequent use of racially offensive statements, chants and signs was an "unintended" by-product of the protests. I conclude that plaintiffs met their burden of showing that defendants' protest activities were motivated by racial animus, and I turn to the question whether defendants established that they would have protested even if they had held no racial bias against plaintiffs.

Defendant Crist's evidence centered on his concern for the fish resource in northern Wisconsin and his friendships with Indian persons over the years. In connection with the latter, it is telling that not one Indian was called to testify regarding defendant's asserted lack of racial animus. Several people testified that they had observed defendant treating Indians well before the protests began, but none of these witnesses were Indian themselves. This testimony was of little significance. It is one thing to treat a group well when its members present no economic or personal inconvenience; it is quite another to continue to treat them that way when they have asserted interests in competition with one's own.

From defendant Crist's testimony and from other evidence in the record, it is clear that defendant Crist is concerned about the effect of Chippewa spearing and netting upon the fish resource in northern Wisconsin. His concern is not a wholly altruistic one: it stems from his enjoyment of fishing and his resentment of any infringement on his opportunity to enjoy the sport. The question, however, is not whether his and STA's con-

cern for the fisheries and for hook-and-line fishing is selfless but whether defendants have proved that it is so compelling that defendants would have engaged in the extended protests on the lakes and landings in the long cold nights of a northern Wisconsin spring had it not been for the racial animus they and their supporters felt toward the Indians who were threatening their sport. I conclude that they did not. Although defendants would have been angry at anyone who restricted their fishing (including the Wisconsin Department of Natural Resources), it was a particular source of irritation that the threat came from persons they despised, whom they saw as fat, lazy, living on welfare at taxpayer expense and lacking appreciation for the wildlife resources of northern Wisconsin. The animosity for Indians as a group is what provided the fuel that kept protesters warm at the landings at ice-out time. Defendant Crist knew this and he employed it to his own ends deliberately. *Cf. Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir. 1974), *cert. denied*, 419 U.S. 1070, 95 S.Ct. 657, 42 L.Ed.2d 666 (1974) (although defendant was motivated solely by profit, defendant violated § 1982 when it exploited opportunities created by racism to sell homes to blacks at excessive prices).

Defendants made almost no attempt at trial to refute the evidence of racial animus on the part of STA or to demonstrate that STA members would have interfered with the spearing in the absence of racial animus. Not a single STA member besides defendant Crist testified in refutation of plaintiffs' accounts of the protests. Defendants adduced no specific evidence except to show that STA buttons and hats were not sold until 1990 and that blaze orange was the color worn by another protest group, not STA. In contrast, plaintiffs adduced evidence of strong racial animus on the part of STA board members Al Soik, Tommy Handrick and Dave Worthen and other leaders of STA such as Jack Lanta, Elaine Soik, and Howie Caputo, as well as defendant Crist, who variously employed demeaning chants and slogans and displayed the demeaning mudflap poster.

Plaintiffs proved that defendants' protest activities were motivated by racial animus; defendants failed to prove that the protest activities would have occurred in the absence of such animus. Accordingly, I will grant plaintiffs' request for a permanent injunction. As I have emphasized in past orders, the injunctive relief that will be ordered is not intended to reach defendants' verbal expression of their views. It is intended only to enjoin defendants from physical interference with plaintiffs' exercise of their treaty-protected fishing rights.

## ORDER

IT IS ORDERED that defendants Stop Treaty Abuse–Wisconsin, Inc. and Dean Crist and all those acting in concert with or at the direction of these defendants are enjoined permanently from

a) Assaulting or battering any member of the Lac du Flambeau band or any member of the family of a Lac du Flambeau band member at any landing or on any lake within the ceded territory;

b) Intentionally creating wakes on any waterway to interfere with any spearer;

c) Planting decoys in any waterway;

d) Intentionally blocking spearing boats from moving from the boat landings out to the spawning beds;

e) Shining lights into the eyes of any spearer or spearing boat operator while on the water;

f) Playing "leapfrog" with any spearing boat, or otherwise impeding the progress of any spearing boat; and

g) Taking any other action that is intended to or may reasonably be expected to interfere with plaintiffs' exercise of their spearing rights.

IT IS FURTHER ORDERED that the order for costs and fees entered herein on July 17, 1992 is reinstated and plaintiffs are entitled to an award of attorney's fees, pursuant to 42 U.S.C. § 1988, for the work performed since July 17, 1992. No later than February 18, 1994, plaintiffs are to submit a supplemental pleading, setting forth with specificity the fees and costs incurred since the entry of the July 17, 1992 order. Defendants may have until March 4, 1994 in which to file and serve their objections to the fees

and costs set out in the supplemental pleading.