In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1055

LUBAVITCH-CHABAD OF ILLINOIS, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

NORTHWESTERN UNIVERSITY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 7571 — **John W. Darrah**, *Judge*.

ARGUED OCTOBER 28, 2014 — DECIDED NOVEMBER 6, 2014

Before BAUER, POSNER, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. There is a branch of Hasidic Judaism (on Hasidic Judaism see the article of that name in *Wikipedia*, http://en.wikipedia.org/wiki/Hasidic_Judaism#Characteristic_ideas (visited November 6, 2014, as were the other websites cited in this opinion)) known as Chabad (with the "Ch" pronounced like the German "ch" in Bach or Achtung) or Chabad-Lubavitch (with the accent in "Lubavitch" falling on the second syllable). "Chabad" is an acronym for the He-

brew words for wisdom, understanding, and knowledge, and Lubavitch is the name of the Belorussian village to which the headquarters of the movement moved shortly after its beginning in the eighteenth century and remained for a century. Chabad has grown to be one of the largest (maybe the largest) Jewish religious organizations in the world, with branches in many countries. It emphasizes mysticism over the legalism emphasized in other branches of Judaism and its ritual and observances are distinctive. (For additional detail see "Chabad," *Wikipedia*, http://en.wikipedia.org/wiki/Chabad.)

There are Chabad "emissaries," as they are called, on many American college campuses. The emissaries manage "Chabad houses" located on or near the campuses. The Tannenbaum Chabad House is located near Northwestern University's main campus, in Evanston, Illinois. Since 1985, when the house was founded, it's been presided over by a Rabbi named Dov Hillel Klein. For a video of him, see "L'Chayim" ("to life"), Nov. 18, 2007, www.youtube.com/watch?v=r9cA-YjohnQ. (Considerable other online material about him can be obtained by Googling his name.) He is a colorful figure and is at the center of this case, which pits him and the Illinois chapter of Chabad against the university and two of its officials; for simplicity we'll pretend that Rabbi Klein is the only plaintiff.

Until the university broke with him as described below, Rabbi Klein had a sideline: Northwestern paid a company called Sodexo to provide food for its students and Sodexo agreed with Chabad to pay Klein for rabbinic supervision of the company's provision of kosher food to Northwestern in

order to ensure compliance with kosher law. Northwestern reimbursed Sodexo for the payments to Klein.

Religious organizations that desire access to particular Northwestern facilities and services (for example, in the case of Jewish religious organizations, access to the names of Jewish students matriculating at Northwestern) must be "recognized" by the university's chaplain. Tannenbaum Chabad House had from its founding been one of the university's religious "affiliates," the university's term for the religious organizations that it recognizes. But in 2012 it terminated its affiliation with the Chabad house.

Back in 2001 the university had learned that underage students (the drinking age in Illinois, as in all states, is 21, except that an alcoholic beverage can lawfully be served to a person under 21 "in the performance of a religious ceremony or service," 235 ILCS 5/6-16(a)(iii)) had vomited after excessive consumption of alcoholic drinks at a party at Tannenbaum Chabad House. One of the students had to be hospitalized. In the wake of that incident the university's chaplain met with Rabbi Klein and emphasized to him the need to control the consumption of alcohol at his Chabad house. Nevertheless in 2005, at a dinner in a university dining hall to celebrate the Bar Mitzvah of Rabbi Klein's son, alcohol was served, including to underage students, even though when reserving the dining hall Klein had assured the responsible university official that no alcohol would be served. And not only wine but also hard liquor, mainly scotch and vodka, was served.

Although the chaplain spoke to Klein about the incident and extracted an apology from him, alcohol, including hard liquor, continued to be served to students at the house, both

on Jewish holidays and on Friday evenings, when the Jewish Sabbath begins. The students who attended these affairs were not asked to present proof of age, though undoubtedly many were under 21—most college students are. Rabbi Klein testified that to require attendants at the events to carry identification would violate religious law. He made no effort to limit consumption of alcohol at the events and drank along with the students attending. There is evidence that he was himself intoxicated at some of these events, though he denies that.

As far as we've been able to determine, plying minors with hard liquor is not required by any Jewish religious observance. It's true that according to some adherents of Chabad Lubavitch "it is a mitzvah [a divine command] to drink, and drink to excess, on Purim" (and possibly on other holidays as well). Yanki Tauber, "The Purim Drink," www.chabad.org/holidays/purim/article_cdo/aid/2814/jewish/The-Purim-Drunk.htm. But drinking an alcoholic beverage is not mandatory; one is allowed to be drunk simply on "happiness." Tzvi Freeman, "Purim & Alcohol," www.chabad.org/holidays/purim/article_cdo/aid/1146 095/jewish/Purim-Alcohol.htm#footnote2a1146095. Klein acknowledges that grape juice can be substituted for wine on the Sabbath; what we don't know is whether it is considered proper under Jewish law and excused by secular law to permit or encourage minors to drink hard liquor on Purim or other Jewish holidays.

Another rabbi, not of the Chabad persuasion, whose son was a graduate of Northwestern, complained to the university chaplain about the drinking at the Chabad house, at the same time acknowledging that he had religious differences

with Rabbi Klein. The chaplain relayed the complaint to the university's vice president for student affairs, prompting her to conduct an investigation. On the basis of the results of the investigation and with the agreement of the chaplain, she decided, and informed Rabbi Klein, that unless he was replaced as the head of Tannenbaum Chabad House the university would terminate its affiliation with it. (Both the chaplain and the vice president for student affairs are codefendants with the university in this suit.) Klein was not replaced, and continues to supervise the activities of the house as before—but the university made good on its threat to disaffiliate.

Among the consequences of disaffiliation, Klein alleges, he and his Chabad house were barred from "contracting with Sodexo." The letter in which Northwestern informed Klein of the disaffiliation stated that as a result of it Klein's role as a consultant to Sodexo could not be renewed. Sodexo followed up with a letter to Klein terminating their consulting agreement.

Originally this suit claimed that the disaffiliation, and also the resulting cancellation of Klein's contract with Sodexo, were motivated by antisemitism and for that reason violated two federal antidiscrimination statutes, 42 U.S.C. § 1981 and 42 U.S.C. § 2000d. The district court disagreed and granted summary judgment in favor of the defendants, precipitating this appeal, in which however Klein has dropped his challenge to the dismissal of his section 2000d claim.

Section 1981(a) provides that all persons "shall have the same right … to make and enforce contracts … as is enjoyed by white citizens." The kosher supervision contract was, obviously, a contract; and section 1981(b) defines making and

enforcing a contract to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." As for affiliation between the university and religious groups, this too is, if less clearly, contractual, because the university grants specified privileges to the group and in return they assume specified responsibilities and must supply the university with certain information. See "Student Religious Organizations and Advisers at Northwestern University," www.northwestern.edu/religious-life/media/pdfs/Priv ileges-and-Responsibilites-of-Religious-Orgs3.pdf. There is sufficient mutuality to make affiliation a contractual arrangement.

Most Jews are white, but section 1981 has been interpreted to provide a remedy to members of any racial or ethnic group. Judaism of course is the name of a religion rather than of an ethnic group, but persons whose parents are Jewish are considered Jewish even if they (and their parents, for that matter) are entirely secular. (In the United States, Jews who convert to another religion generally are no longer considered Jewish.) Secular Jews form not a religious group (obviously), but an ethnic group, just as the Irish do even though many Irish people, like many ethnic Jews, are not religious.

Rabbi Klein does not argue that the disaffiliation of Tannenbaum Chabad House was motivated by hostility to ethnic Jews; and that would hardly be plausible, considering how many Jews there are in the university's student body, faculty, and administration. Even the university's president, Morton O. Schapiro, is Jewish. Klein argues rather that the motivation for disaffiliating was hostility to the Chabad sect. Even if true, this does not help Klein's case. For there is no

mention of religious discrimination in section 1981, or for that matter in the other (the abandoned) ground of his suit, section 2000d, which forbids discrimination "on the ground of race, color, or national origin" by recipients of federal financial assistance (which includes Northwestern). The Supreme Court held in *Shaare Tefila Congregation v. Cobb*, 481 U.S 615, 617 (1987), that 42 U.S.C. § 1982, which provides that "all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property," protects "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics."

The only difference between sections 1981 and 1982 is that one deals with contracts and the other with property. Neither refers to discrimination on the basis of religious identity, beliefs, or observances. The Supreme Court's ruling in *Shaare Tefila* that section 1982 protects only groups defined by "their ancestry or ethnic characteristics" therefore applies equally to section 1981. *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1261–62 (7th Cir. 1990); *Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 49–50 (7th Cir. 1984). And so that section does not "protect against discrimination based on sex or *religion* or age." *Id*. (emphasis added, footnotes omitted).

Against this Klein cites *Bloch v. Frischholz*, 587 F.3d 771 (7th Cir. 2009) (en banc), which held that a condominium association's prohibition against displaying mezuzahs (a mezuzah is a piece of parchment, usually encased, containing a Hebrew prayer and displayed on the front-door frame of a home) was forbidden by the Fair Housing Act, because it

was discriminatory. The opinion does mention section 1982 in passing, as an additional basis for the ruling, but the condominium association's discrimination was based on hostility to Jews, not, as alleged in this case, hostility based on a religious disagreement.

There is more that is wrong with Rabbi Klein's case. There is no evidence that the apparent distaste for Chabad of the former student's father who complained to the university about the alcohol problem at the Chabad house influenced the university's decision to investigate Klein; so far as appears, the investigation was precipitated by the father's complaint about the heavy drinking there. And the only discrimination—treating differently things that should be treated alike—alleged is that the university staff did not take the same measures against student organizations that it did against the Chabad house, even though, as is well known, excessive (and underage) drinking is common in such organizations, notably fraternities. But unlike Chabad houses, fraternities are not managed by adults and are components of the university rather than separate entities merely affiliated with it. And the fraternity drinking incidents to which Klein refers occurred before the current vice president of student affairs assumed office, so leniency regarding such drinking was the policy of a different decision-maker.

As is apparent from the Klein video that we cited at the outset of this opinion, Rabbi Klein is lively, engaging, eminently approachable, enthusiastic, and one might even say charismatic. Were he more responsible concerning underage and excessive drinking by the kids who frequent the Chabad house, the university would have maintained its affiliation with the house. Klein says that the university should have

told him to exercise closer supervision over alcohol consumption at the house, as a condition for retaining the affiliation, and that had the university done this he would have complied. In other words, he wants a second chance. But he admits that he never asked for that second chance. He had gotten away for more than a quarter of a century with an irresponsible attitude toward excessive underage drinking that went on under his nose in the Chabad house, and seems to have thought that he could continue to do so, with impunity, indefinitely. He was given multiple chances. He was warned repeatedly, but did not react. Why should he be given fourth and fifth and nth chances? Had he stepped forward on his own initiative and promised to mend his ways, the Tannenbaum Chabad House might still be a Northwestern University affiliate.

The judgment of the district court dismissing the suit is

AFFIRMED.

BAUER, *Circuit Judge,* concurring. I cheerfully concur in this enlightening opinion. The background and the various nuances of the religious groups discussed, or alluded to, are not taken from the record of the case but are both enlightening and, I confess, entertaining. Since the result meets my legal and religious inclinations, I have no reason not to endorse the dissertation and ruling and therefore I do.